Robert W. Sadowski
Robert W. Sadowski PLLC
800 3rd Avenue, 28th Floor
New York, New York 10022
Tel. No.: (646) 503-5341
rsadowski@robertwsadowski.com

*Attorneys for Plaintiff Amro Ali, M.D.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMRO ALI, M.D., <br><br>       Plaintiff, <br><br> - against - <br><br> WESTCHESTER MEDICAL CENTER and NEW YORK MEDICAL COLLEGE, <br><br>      Defendants. | **COMPLAINT** <br><br> **Civ. No.** |

   Plaintiff Dr. Amro Ali ("Dr. Ali" or "Plaintiff"), by and through his attorneys, Robert w. Sadowski PLLC, alleges for his complaint as follows:

### PRELIMINARY STATEMENT AND NATURE OF THE ACTION

   1.  This is a civil action brought by Plaintiff against Westchester Medical Center and New York Medical College ("WMC-NYMC" or "Defendants") for discriminatory treatment because of his nationality and age, who has been abused under the umbrella of a "dream of residency that turn to be nightmare." Plaintiff seeks injunctive and compensatory relief. Specifically, he seeks appointment to Defendants' residency program, which at the times relevant hereto had an opening in their residency program. Plaintiff also seeks compensatory damages for the potential years of work as attending physician that he lost for delaying his graduation from the residency program.

2.     Plaintiff has been in the United States of America for more than ten years and has been the subject of discriminatory treatment in many settings, however, for fear of the consequences and potential retaliation he has been reluctant to voice his concerns and complain of the discriminatory treatment.  However, finally, Dr. Ali has found the clinical management at WMC-NYMC destroying his career, reputation, livelihood, and family with its arrogant lies, misrepresentation, and discriminatory treatment.

3.     Over the past three years Dr. Ali has been misled by false promises and discriminatory treatment in connection with his application for an ophthalmology residency which is well documented in correspondence and with the awareness of his mentor, Dr. Sansar Sharma.  Specifically, Program Director, Dr. Thaddeus Wandel and Dr. Sansar Sharma informed Dr. Ali that the Director of Graduate Medical Education ("GME"), Dr. Fredrick Z. Bierman, is requiring Dr. Ali to pass the United States Medical Licensing Examination ("USMLE") step 3 before Dr. Ali can start a residency position because Dr. Ali is a foreign medical graduate.  An opening had been posted and the position offered to Dr. Ali when another resident dropped her position in December 2016, however, Defendants nonetheless required Dr. Ali to pass of USMLE step 3 as a condition for this position.  This position has been offered to Dr. Ali after more than two years of volunteer work for the ophthalmology department.  Dr. Ali raised his concern that step 3 is not mandatory to start his residency position and this extra requirement is not legitimate according to the WMC-NYMC contract, Federal State Medical Board (FSMB) and New York State Medical Board (NYSM).  (Exhibits 8 & 12).

4.     Dr. Ali has discussed this issue "Passing Step 3 as an extra-requirement for foreign medical graduate" with Dr. Wandel and Dr. Sharma on many occasions and both of them confirmed that Dr. Fredrick Z. Bierman, Director of GME office, directed that passing the step 3

USMLE is a condition that Dr. Ali must satisfy in order to be admitted to the residency program as "he is foreign medical graduate."  This requirement is not imposed on American Medical Graduates.  This disparate treatment of foreign medical graduates from American medical graduate is against all rules and regulations in the health care system; this is discrimination based on national origin.  This issue has been brought to the attention of the American Councils Graduate Medical Education ("ACGME"), who confirmed that this condition constitutes discriminatory harassment. (Exhibit 1, 7, 11, 16 & 33).

5.      Dr. Ali contacted the Federal State Medical Board (FSMB) and New York State Medical Board (NYMB) and both of them also confirmed that USMLE step 3 is a requirement for qualifying for a state licensure but not required for commencing a residency program. (Exhibits 8 & 12).

6.      Moreover, according to the WMC institute contract, "[E]very WMC-based categorical residency training program at WMC require trainees to pass Step 3 of the USMLE . . . examination sequence prior to the end of their second year of training."  WMC Resident /Fellow Agreement, Terms of Appointment, Policies and Procedures 2016-17 at 40. (Exhibit 10).  In addition to that, FSMB stated that "With the exception of the eligibility requirements, the ACGME has no requirements regarding the timing of the step 3 exam.  If a program is treating International Medical Graduates and American Medical Graduates differently, that may fall under the requirement regarding policies to prevent harassment." (Exhibit 12).

**From:** MEDBD <MEDBD@nysed.gov>
**Date:** January 30, 2017 at 2:56:47 PM EST
**To:** Amro Ali <amro.ali9@icloud.com>
**Subject: RE: Does starting residency in Ophthalmology require passing USMLE step 3? Please help**

Hello,

If you are in an ACGME-approved residency you do not need a Limited Permit or full license in order to perform the residency, unless the employer requires it. If it is not approved, you will need either the Limited Permit or the license. The Limited Permit requires medical education and either 3 years of ACGME-approved post-graduate training, or 6 years of non-ACGME-approved post-graduate training, but not a passing score for USMLE Step 3. The Limited Permit gives you two years in which to take and pass the exam and is renewable once. The full license requires the same education and training requirements and also a passing score for all 3 USMLE exams. I hope that answers your questions.

Kind Regards,

NYS Boards for Medicine, Veterinary Medicine and
Dietetics and Nutrition; and State Committees for
Athletic Training, Medical Physics and Perfusion.
518-474-3817 ext 560
518-486-4846 fax

---

**From: Legal** legal@acgme.org **Subject:** RE: IMG

**Date:** July 11, 2018 at 11:00 AM
**To:** Amro Ali amro.ali9@icloud.com, Legal legal@acgme.org

Please review the program requirements. With the exception of the eligibility requirements, the ACGME has no requirements regarding the timing of the step 3 exam. If a program is treating IMGs and AMGs differently, that *may* fall under the requirement regarding policies to prevent harassment.

Again, I think the best resource for you will be the Ombudsperson. Please see the links below for contact information.

7.     The Program Director, and Drs. Wandel and Sharma told Dr. Ali that WMC only accepts American Medical Graduates (AMG) without passing the step 3 exam, but Foreign Medical Graduates (FMG) must pass step 3 before starting the residency program.  In fact, counsel for the ACGME confirmed that treating foreign medical graduates (FMG) differently from American medical graduates (AMG) is counter to the requirement of having policies that prevent harassment. (Exhibit 12).

8.     Dr. Ali has distinguished himself, and by doing "unpaid" work at WMC which greatly benefited the institution with the understanding that Dr. Ali's published research would advance the standing of WMC-NYMC and garner him a residency position.  Indeed, prior to Dr. Ali publishing several works and obtaining grants for research, WMC-NYMC was sorely lacking

in research publications, which adversely affected the prestige and academic standing of the institutions. Attached hereto is a copy of Dr. Ali's CV. (Exhibit 5)

9.      In October 2015, after finishing most of his residency at Alexandria University in Egypt, and four clinical fellowships in U.S. programs, and having been awarded a grant from the glaucoma foundation, Dr. Ali moved from New York University to WMC.  At that time, Dr. Wandel expressed to Dr. Sharma and Dr. Ali that WMC needed to produce more research and publications and in exchange for Dr. Ali's research and publications, at which he excelled, he would obtain a residency position.  Lack of research activities and publications were an area of remarkable weakness to the ophthalmology residency program at WMC-NYMC as per Dr. Sharma when the ACGME reviewed the program evaluation and the program was on probation.

10.      In December 2015, New York Medical College ("NYMC") hired Dr. Ali full-time as a clinical instructor in the Department of Ophthalmology based on the recommendation of the chairman of ophthalmology, Dr. Wong to Dean Miller at that time. (Exhibit 34).  The Department of Ophthalmology is operated by NYMC and WMC; this appointment allowed Dr. Ali to submit grant proposals and many Institutional Review Board ("IRB") studies from the Department of Ophthalmology.  For this work, Dr. Ali was unpaid.

11.      Dr. Wandel signed Dr. Ali's New York license application from the New York State Medical Board (Limited Permit: P61051) to apply for clinical privileges allowing him to practice with ophthalmology residents in different clinical aspects and to be involved in teaching the uveitis curriculum.  (Exhibit 6).  Dr. Wandel, however, failed to deliver his commitment to obtain him any clinical privileges which was an essential element of the appointment of Dr. Ali, but Dr. Ali has continued to participate in residents' education by giving them lectures in the uveitis based on the request from Dr. Wandel and Dr. Hutcheson. (Exhibits 19 & 35).

12.     Over the past three years, Dr. Ali published more than 8 scientific papers based on his own conceptions, 2 chapters in a textbook, 2 IRBs, and applied for many grants for research funding.  Dr. Ali added Dr. Wandel's name to many of these works to make the WMC-NYMC program appear as a research and academic institution more prestigious, Dr. Ali received no remuneration in return, instead expecting based on WMC-NYMC representations that the institution would grant him a residency.

13.     In November 2016, Dr. Ali applied to the San Francisco Match and was formally interviewed at WMC.  While Dr. Ali did exceptionally well, and the attending physicians expressed great appreciation for his work, Dr. Ali has reason to believe that by reason of the false pretext that a resident gave negative feedback, he was unsuccessful.

14.     Dr. Ali has been interviewed by two attending physicians who were very excited and supportive to his application: (i) Dr. Gerald Zaidman was very supportive to Dr. Ali's application and he spoke to Dr. Ali's mentor, Dr. Sharma before the Dr. Ali's interview.  Dr. Zaidman was very supportive during the interview process based on Dr. Ali's CV and Dr. Sharma recommendations.  Dr. Zaidman mentioned that Dr. Sharma is very supportive to Dr. Ali and he told him "If you manage three kids, you can manage three residencies."

15.     Dr. Ali also interviewed with another external interviewer Dr. Davae, pediatric ophthalmologist from Metropolitan hospital.  Dr. Ali met with Dr. Davae after the interview at Metropolitan Hospital where Dr. Ali was doing his orientation and preparation to start his residency.  Dr. Davae was very excited about Dr. Ali's research when Dr. Davae met Dr. Ali, she was also very supportive to his application.

16.     Dr. Wandel mentioned to Dr. Sharma that residents were not supportive of Dr. Ali's residency, especially Dr. Eric Rosenberg.  Dr. Ali spoke to Rosenberg, with whom he had

6

worked. Dr. Rosenberg expressed his frustration to Dr. Ali and also to Dr. Sharma because Dr. Ali did not yet start his residency training.

17.     Dr. Ali spoke to Dr. Rosenberg openly why did he think that he did not have support from residents.  Dr. Rosenberg was clear in his answer, "this is lie."  Residents have no reasons not to support Dr. Ali.  So, Dr. Wandel has no basis for his statement that Dr. Ali did poorly in the interview and he was ranked in the lower third of the ranking list.

18.     Dr. Wandel had promised Dr. Ali the position to start on July 2018 and possibly to start earlier than that when Dr. Star White, PGY2 resident dropped her position in December 2016.  (Exhibits 1, 2, 4, 7, 9, 11, 13, 17).

---

**From: Amro Ali** amro.ali9@icloud.com **Subject:** Re: Thanks and have happy New Year.

**Date:** December 31, 2016 at 11:14 AM
**To:** Wandel, Tad Tad.Wandel@wmchealth.org

Dear Professor Wandel,
This is my dream, Thanks you for this great trust.
I will do everything to prove myself and to meet your expectations. Amro

On Dec 30, 2016, at 07:42 PM, "Wandel, Tad" <Tad.Wandel@wmchealth.org> wrote:

Hi Ali
Take Step 3 on the earliest date - 1/23-24 will have to do .
There is a high likelihood that you might start as soon as we learn that you passed Step 3 - not 7/1/2018. Happy New Year for you and your family
TW

---

19.     According to Dr. Wandel's representation to Dr. Sharma, Dr. Ali was to start in July 2018 in a residency position outside of the San Francisco Match, however, Dr. Wandel represented that Dr. Ali's residency was not supported by the other residents and this is why Dr. Ali could not be ranked high in matching process.  Dr. Wandel represented that he was still interested in hiring Dr. Ali based on his work and strong recommendation from Dr. Sharma.

20.     At the end of December, 2017, Dr. Star White, one of the PGY 2 residents dropped her residency position unexpectedly.  Dr. Ali was offered that vacated position with the condition that he must pass USMLE step 3 before starting.  While working toward completing step 3, the Program Director directed Dr. Ali to attend the clinics at Metropolitan hospital and WMC hospital to become familiar with the system and electronic medical records so that as soon as Dr. Ali passes step 3, he could start right away. (Exhibits 1, 2, 4, 7, 9, 11, 13, & 17). During this time, Dr. Ali discussed many times that successful completion of the step 3 exam is not required to commence the residency, and that he could, under ACGME and WMC-NYMC policy start the residency program and take the step 3 examination during his residency as is contemplated by the rules, and which, American medical graduates (AMG) are allowed to do.

21.     In April 2018, Dr. Ali passed step 3, however, by that time, a new Chairperson Dr. Kelley Hutcheson joined the Department.  Dr. Hutcheson, with Dr. Bierman's assistance, created an extra position at PGY2 level and created the required funding for the position for no reason except to offered to a candidate who used to work for the chairman in Qatar.  This position was neither posted nor did the Qatari candidate undergo a formal interview contrary to the normal logistics and procedures that provide equal opportunities for all candidates.

22.     WMC has claimed that Dr. Ali was never promised anything.  WMC falsely claimed that the Qatari resident had grant funding from the National Institute of Health.  (Exhibits 26, & 27). NIH funding is public information and everyone has access to it; no records show that the Qatari resident had an NIH grant.  It is well known to all people in the field, that NIH grants are only offered to well established researcher, not to a candidate with no publications. (Exhibit 28).

23.     After Dr. Ali raised his concerns, a new hurdle was placed before Dr. Ali, when

Dr. Hutcheson baselessly questioned Dr. Ali's clinical skills without any reason or

any previous work experience with Dr. Ali.  On the contrary, Dr. Ali has impeccable

clinical skills, substantiated by more than ten recommendation letters from prestigious

institutions in the United States as well as very strong letters from Drs. Wandel and Sharma.

(Exhibits 3 & 5).

      24.     Dr. Sharma offered Dr. Hutcheson a solution that she could offer Dr. Ali a one-

month observation or externship so she can test Dr. Ali's clinical skills and bedside manner, but

she ignored this offer.

      25.     Confronted with this new discriminatory hurdles, on July 2, 2018, Dr. Ali met

with Dr. Wandel in his office, where Dr. Wandel agreed that Dr. Ali was not being treated fairly

and Dr. Wandel agreed to work with Dr. Hutcheson to resolve these issues.  Dr. Ali also updated

Dr. Sharma about the meeting and also sent an email to Dr. Wandel about the meeting and the

proposed plan to resolve these issues. (Exhibit 15)

---

**From: Amro Ali** amro.ali9@icloud.com **Subject:** Thank you

Date: July 2, 2018 at 5:37 PM
To: wandel@wcmc.com, Tad Wandel tad.wandel@wmchealth.org

Cc: Sansar Sharma SANSAR_SHARMA@NYMC.EDU

Dr. Wandel,

Thanks for your time, I was very disappointed with hiring another candidate without even offering me a
fair chance to present my work and Cv which I achieved over years of practice and research in USA
especially I have been promised the chance before and I have been accepted by the department and CME office.

I worked as volunteer for three years in addition to four clinical fellowships (Retina, Neuro ophthalmology,
Uveitis) and more than 20 publications compared to a candidate who just practiced in USA only for one
year of surgery at Saini hospital i, MD (2014-2015) and have no publication records (zero publication)
especially if we are both IMG.

My CV and supplementation recommendation letters and clinical fellowships certificate is attached.

---

Thanks again for your kind support and looking forward for your kind reply based on our discussion today hoping for accommodating me for a spot in your residency program as we explored.

Amro

26.    Dr. Ali interacted with Dr. Hutcheson on many occasions and she was impressed with his performance on many correspondences. (Exhibits 14, 18-25).  Finally, Dr. Wandel advised Dr. Ali to communicate with Dr. Hutcheson directly, so Dr. Ali sent an appeal letter to express his concern about being misled by the department and inability of the ophthalmology Department to fulfill the commitment after few years of unpaid work. (Exhibit 32).

27.    During July 2018, Dr. Ali made three attempts to contact Dr. Bierman, the head of GME, to discuss the requirement for passing step 3, which delayed/blocked Dr. Ali from admission to the ophthalmology residency, but Dr. Ali received no response to his emails. (Exhibit 16).



**From: Amro Ali** amro.ali9@icloud.com **Subject:** Re: Step 3 requirement

**Date:** July 17, 2018 at 12:37 PM
**To:** Fredrick_Bierman@NYMC.EDU

Dr.Bierman,
This is my third email asking for explanation. I would appreciate your response.

Amro Ali.MD
On Jul 13, 2018, at 2:24 PM, Amro Ali <amro.ali9@icloud.com> wrote:

Hi Dr.Bierman,
I hope that you received my email. Regards,

Amro Ali.MD
On Jul 12, 2018, at 2:29 PM, Amro Ali <amro.ali9@icloud.com> wrote:

Hi Dr.Bierman,

I hope this email finds you great, my name is Amro Ali and I applied into ophthalmology residency program 2016 where I have been formally interviewed.

I was promised to start July 2018 conditioned that I passed step 3 but when PGY2 resident (Start white) dropped her position and I was asked to take step 3 test ASAP as my start earlier. By that time, I contacted NYSMB and FSMB and they explained to me clearly that step 3 is a requirement for licenses not for starting residency.

I found the contract of WMC denoted that taking step 3 is required before you complete PGY2 so you promoted to PGY3 and it is not required to start PGY2. I explained that to PD, Dr. Wandel and Dr. Sharma was also aware about these discussions but Dr. Wandel insisted that is this policy for IMG and these terms in the contract for AMG and not for IMG. Dr. Wandel referred this to your recommendations as director of GME office.

Based on this promise, I did my medical clearance and I was asked by Dr. Wandel and his assistant "Valerie by that time. "to attend at Metropolitan hospital shadowing the residents to learn EMR. I was asked also to attend WMC to learn about admission.

Everything was on hold for that. As I passed my step 3 later as I was working as volunteer and I have to do extra things to support myself and family, It was a challenge, I found that not only the position but the promise has been vanished. I contacted ACGME this week, they mentioned that step 3 is not requirement by them and even if it is required in the contract should no treated AMG and IMG differently. Now, this cost me damage for one year and losing the position after three years working as volunteer in the department especially as I was promised by Dr. Wandel to start July,2018 with likelihood to start earlier if I pass step 3.

I would like to meet with you to present that and to understand circumstances around asking me for taking step 3.

Best Regards,

Amro Ali.

28.     During this time, and over few months Dr. Ali attempted to meet with Dr.

Hutcheson to learn what is planned for him and if the department would fulfill the promise or

not. On July 20, 2018, Dr. Ali was granted a meeting with Dr. Hutcheson but was also joined by

Dr. Bierman and Dr. Wandel. Attending the meeting was also Dr. Hutcheson's assistant,

Michelle Hodge.

11

29.     During this meeting, Dr. Bierman reiterated his position that Dr. Ali must pass the step 3 exam to begin the residency.   The other attendees, Dr. Wandel and Dr. Hutcheson, remained silent.  Dr. Bierman explained that this was one time offer and that we can do nothing for you.  Dr. Bierman became angry when Dr. Ali explained to him that the contract states that residents can take step 3 during their residency and is not mandatory before starting his residency.   Dr. Ali asked,  "Why do you insist on passing step 3 before starting the residency if the contract did not say so", then, Dr. Bierman screamed and asked "How did you get the contract, we did not send it to you.  Dr. Ali answered him that it is available online.  Please see link to the contract:

https://www.westchestermedicalcenter.com/.../WMC-SampleAgreeement20...

 Dr. Bierman said that "I am not here to argue with you."  When Dr. Bierman finished the meeting, he asked Drs. Wandel and Hutcheson to leave.  Dr. Ali was the last one to leave and as he left he shook hands with Ms. Hodge and thank her for her help.   Ms. Hodge told Dr. Ali that she is sorry and she wished to see him in better situation.

30.     On June 11, 2019, counsel for WMC stated that "Dr. Ali became emotional and threatened to sue the hospital and was led out of the meeting by security."  This statement is completely untrue and if Dr. Ali had acted emotionally, he would have been disciplined and there would be a record of this indecent by security.  Moreover, this alleged emotional reaction by Dr. Ali was not even mentioned to Dr. Sharma.  Security cameras, Ms. Hodge's notes, and any security notation will belie the assertion that Dr. Ali became emotional during the meeting. After three years working without pay for WMC-NYMC, under the promise that Dr. Ali's outstanding research and publications (an area where WMC was sorely lacking), would garner

him a residency, however, as a result of the discriminatory hurdles, he is no better positioned in

his career.  WMC-NYMC has misled Dr. Ali, discriminated against him, with the result of a

years-long delay in earning potential.  Damages to his reputation, career advancement, and

compensatory damages are significant.

31.     On September 5, 2018, Dr. Ali formally presented his claims to WMC's attorney,

Barbra Krakowski, who responded to him and claimed several pretextual reasons for the

discriminatory treatment of Dr. Ali.  WMC claimed Dr. Ali graduated medical school in 1994

and passed the USMLE Step 1 and 2 with low scores in 1998.  However, NYMC-WMC was

aware of Dr. Ali's scores when he left NYU to go to WMC-NYMC. (Exhibit 4) He was asked to

do research work for NYMC-WMC and publish as much as he could because NYMC-WMC was

on probation for lack of academic activities according to Dr. Sharma.  With respect to his Board

scores, that is but one historical part of his CV—the import of which is diminished by his 4

clinical fellowships and more than 20 publications, including obtaining funding from the

glaucoma foundation.  His Board scores were well known, but he received an interview from

NYMC and was awarded a position teaching.  If his Board scores were truly an eliminating

factor, then Dr. Ali has been misled during the almost three years that he continued to work for

NYMC-WMC without pay.

32.     The next speculative and pretextual reason raised by WMC-NYMC was a

question why Dr. Ali did not continue/complete his residency training at Northshore LIJ,

where he worked prior to NYU and WMC-NYMC.   Dr. Ali knew that one year of

clinical experience is required to improve his chances to advance his career in

ophthalmology.  After NorthShore LIJ, he worked a series of clinical fellowships in

different areas and continued his research, which is a valuable contribution to his

field.  These years of hard work and dedication to ophthalmology in the United States should be a credit to his professional development, enthusiasm, and genuine interest in the field.

33.     In fact, one cannot compare Dr. Ali's years of hard work against the candidate from Qatar, who after one year of surgery at Mount Saini hospital in 2014-2015, moved to Qatar.  Incidentally, Mount Saini hospital, where this candidate worked, is a community hospital that has only some affiliation with John's Hopkins.  The candidate did not work for John's Hopkins as claimed.

34.     WMC-NYMC also speculated as to why it had taken Dr. Ali some years to take and pass step 3.  This is an irrelevant inquiry because, according to Federal and State Medical Boards, Step 3 is not a requirement to commence a residency, and it is not necessary to take and pass Step 3 except to obtain the final unrestricted state medical license.  Moreover, obtaining an unrestricted license is not feasible for Dr. Ali because an unrestricted license requires formal residency training in the United States, which put Dr. Ali in a veritable "Catch 22."  Most importantly, according to WMC contract page 40, successful completion of Step 3 is required during the second year of residency—and is not a condition for acceptance into the residency.  Upon information and belief, no program in the country requires an applicant for residency to pass step 3 to commence a residency.

35.     The next speculative pretext WMC raised was that Dr. Ali's non-accredited fellowships were in subspecialty areas of ophthalmology—and do not count toward certification, and did not teach or re-enforce his general medical knowledge or knowledge of general ophthalmology.  This is a complete misunderstanding and

14

misrepresentation.  All fellowships in ophthalmology are non-accredited because no board examination is required except surgical retina and oculoplastic—even medical retina is non-accredited.  *See AUPO and American Board of Ophthalmology.*  Also, the chairman fellowship in pediatrics and program director fellowship in glaucoma are both non-accredited fellowships.  The non-accredited fellowships were clinical fellowships, where Dr. Ali was treating patients.  Drs. Wandel and Sharma letters extoll his clinical work, as well as letters from his mentors who expressed in recommendation letters Dr. Ali's bedside manner and patient feedback.

36.     Oddly, WMC-NYMC claimed Dr. Ali's the research was for NYMC, **not** WMC, and that Dr. Ali did not treat patients at WMC.  When in fact, Dr. Ali worked for the ophthalmology department under NYMC and WMC, and specifically applied for IRBs at WMC.  Further, while WMC operates the residency program, NYMC's Program Director's name was on publications and grants applications, although the work was entirely done by Dr. Ali.

37.     WMC-NYMC also speculates that Dr. Ali probably did not match in the 2016 San Francisco Match at other institutions for all of the reasons he did not match at WMC.  As is indicative of WMC's bias against Dr. Ali, the Director attributed to a resident's one-time statement that Dr. Ali could be too old and slow for the job.  Indeed, Dr. Ali was asked many times if he can wake up early if he is on call.  In contrast to these discriminatory statements, Dr. Ali interviewed with two professors:  Dr. Gerald Zaidman was impressed with Dr. Ali and his work.  Dr. Zaidman told Dr. Ali that if you can manage three children, you can manage a residency very easily.  Dr. Davae, a pediatric ophthalmologist at Metropolitan with whom Dr. Ali worked was very excited and happy

to have him on board.  As to the comment attributed to a resident, who worked with Dr. Ali for a year, that resident told Dr. Ali that Dr. Ali had his full support.

38.     Dr. Ali has much previous training in general ophthalmology, without which he could not have obtained his fellowships in some of the best institutions in the country.  There is little possibility for any candidate to be accepted for an ophthalmology fellowship unless the candidate had outstanding levels of general ophthalmology training.  Moreover, all of his recommendation letters speak highly of his knowledge and clinical skills.

39.     Dr. Wandel told Dr. Sharma and Dr. Ali that it is the policy for foreign medical graduates, according to Dr. Bierman, to have passed Step 3—"this is the policy for foreign medical graduates as Dr. Bierman dictates that."  This "policy" clearly contradicts the NYS Medical Board rule that step 3 is not required for commencing a residency.  (Exhibits 8, 10, & 12).

40.     Dr. Ali first applied in November 2015, one year before the San Francisco Match, for an advanced position of PGY 3, and his board scores and application were well known since that time.  One can only conclude that he was misled to keep him working for free, if as WMC now claims, he was unqualified.  Dr. Wandel's stated plan for Dr. Ali was that Dr. Ali would start on July 1, 2018, in a spot outside the Match, but this plan inexplicably changed when the resident dropped her position.

On Nov 12, 2015, at 8:32 AM, Ali, Amro <Amro.Ali@nyumc.org> wrote:

**Amro Ali, MD**
**Associate Research Scientist.**
**Reproductive Biology and Neuroscience.**
**NYU Langone Medical Center.**
**Office: 212-263-2161**
**Cell: 347-623-5406**

Dear Dr. Wandel,

This letter is part of my formal application to unfilled PGY2 position, at the Department of Ophthalmology at New York Medical College. The enclosed CV contains the full information about my past experiences; however, I would like to bring to your kind attention certain points that I believe demonstrate how my background precisely fits your ongoing needs. The core values of the New York Medical College are excellence, collegiality, and integrity, which create an ideal atmosphere for working productively. New York Medical College is a unique program due to its collegial atmosphere for world-class patient care. New York Medical College is characterized by outstanding clinical training, is an internationally recognized faculty, as well as offering extensive opportunities for international clinical and surgical experiences and unique research opportunities.

With more than 10 years of clinical and research experience in ophthalmology, I believe my background and expertise uniquely fit your needs. In addition to my MD degree acquired from Alexandria University in Egypt, I hold an MSC in Ophthalmology and Visual Sciences from Alexandria University, Egypt. To improve my clinical skills further following graduation, I pursued training in many clinical fellowships in the U.S. These fellowships expanded my knowledge and further strengthened my background. Both the degrees and training I have gained over these years fulfill your department requirements I believe.

During my fellowship training in uveitis, I handled minor procedures and cataract surgeries; some were uveitis complicated cataract surgeries. These experiences boosted my already solid clinical and research foundation still further. I was also able to work on research while fulfilling my clinical duties and published ten articles and four book chapters during that time. I was always fully compliant with the team and a real team player, but found I also work well independently.

I have been with NYU as an associate research scientist since 2012, and my primary goal has been to further improve my own ophthalmology research. After years of hard work and attending grantmanship workshops, I was able to write and fully develop a unique project on "Anti-glycan antibody Immunoprofiles as biomarkers in early detection of exfoliation syndrome" with my colleagues Because of the uniqueness of this project, the Glaucoma Foundation funded it for a full year. My experience with this project indeed strengthened my sense that I can write multiple projects and submit grants with your kind support. I have the opportunity to collaborate with you and  Dr.Sharma and we submitted our grant " Impact of Bariatric surgery on the course of Diabetic Retinopathy."

I appreciate the demands on your time. However, I would like the opportunity to present you with more of my work at a time convenient to you. I hope to discuss how my background and professional experiences can fulfill your department's needs and benefit both you and the department. I have family living in Chicago and my wife is finishing her residency training in internal medicine . We are looking to move to your niece city.

I look forward to hearing from you soon. Thank you for your kind consideration.

Regards,

17

 Amro

Amro Ali, MD

41.     WMC claimed that Dr. Ali did not compare favorably to the resident from

Qatar, who WMC claimed had superior credentials, *i.e.*, coming off an NIH grant at

John's Hopkins, had impressive Step 1 and 2 scores and passed step 3.  The Qatari

resident acquired his medical degree in Lebanon and was thus also required to pass the

step 3 exam.

42.     Regardless of the credentials of the candidate from Qatar, the position

appears to have been specially created for him without formal interviews or postings,

which is unfair to Dr. Ali and other candidates who could have applied for the

position.  Indeed, Drs. Wandel and Sharma had not met or even spoken to the candidate

because this candidate was outside USA.

43.     In addition, according to Dr. Ali's information this candidate just

completed his internship in Mount Sinai hospital—an affiliate of John's Hopkins when he

left for Qatar.  Also, there is no mention of his name in NIH records—and WMC was

unwilling to provide evidence of his having obtained an NIH grant, as was represented.

Moreover, for an USA NIH grant, this resident would have to be in already a full-time

faculty position in order to receive a real grant.  Also, this candidate did not complete his

formal training in Qatar and has no publications.  Dr. Ali in comparison has more than 20

publications, ten with Dr. Wandel's name.  Dr. Ali is one of the few recipients nationwide

with a grant from the glaucoma foundation.  It is very clear, that Dr. Ali's CV--with all of

his contributions in the field between training in general ophthalmology, 4 clinical

fellowships, one grant, and 20 publications is a highly favorable candidate, and having

been passed over in this regard is discriminatory.

44.     Dr. Ali worked successfully for highly prestigious institutions ranking in the top tier in ophthalmology, which unlike WMC, have never been on academic probation.  Dr. Ali has consistently improved his credentials and should clearly be given the residency at WMC.  Dr. Ali's has worked for NYMC-WMC as a non-paid instructor and advanced the prestige of the institution and the Chairman, for the institution to now shut him out is in a word despicable.

45.     WMC, as a pretext, attempts to fault Dr. Ali for not attending another residency program at the other institutions he worked.  Dr. Ali worked hard to build his CV and he achieved much over the last few years between publication, grants, and patient care.  For this hard work, he should be credited with building his CV.

46.     In the Match program, each candidate has a rank list of 20 programs and Dr. Ali made his choices based on the strength of the institutions.  A non-match in a first tear program does not mean he cannot match in other smaller programs; this is why there is rank list.  Which institutions Dr. Ali ranked in the Match program is irrelevant to whether WMC-NYMC discriminated against him.  According to Program Director Dr. Wandel and Director of Research, Dr. Ali performed great work in the department and his name was posted on the department journal by the chairman for his outstanding contributions.

47.     As part of the process we have to go back to EEOC, where we submitted our complaint (x) and Defendant focused on the following: low board scores, old "graduated two decades", was never promised anything, being emotional and agitated in the meeting. facts which we explained in detail with supporting documents to EEOC:

(please see our complaint to EEOC (Exhibit 29) and WMC response to EEOC (Exhibit 30) as well as our final response to EEOC. (Exhibit 31).

48.     Again, Defendant built his defense based on destruction Dr. Ali's image to that extent that, they do recognize or discussed any of the following facts:

- There is formal communication regarding step 3 prerequires to start residency with Drs. Wandel, Berriman, Hutchison.
- All Dr. Ali fellowship are clinical and he also participated in research.
- Dr. Ali was funded from The Glaucoma Foundation.
- If Dr. Ali was not good enough, why he was offered the position from the beginning and he has been asked to attend at Metropolitan hospital (Resident spent half time at WMC and half time at Metropolitan)
  Also, why Dr. Wandel wrote such strong letter and insisted to have him outside the match process.
- Dr. Sharma as he was aware about all details and he has been told on many occasions in person and over the phone that step 3 is required for foreign trained medical graduates Dr. Wandel stated that Dr. Berriman is dictating these rules.
- All my correspondences to FSMB and ACGME asking if step 3 is required to start my residency.
- ACGME email that states treating foreign medical graduate different from American Medical Graduate fall under prevention of harassment policy.
- Emails from Dr. Wandel and his assistant asking about date of results of step 3 at WMC.
- Hiring a candidate from Qatar as he was working with the chairperson there, (Dr. Hutchison was director in eye Hamed clinic for three years in Qatar while their other internal strong candidate who is supported by Drs. Wandel and Sharma.
- This position was created and funded for this candidate from Qatar. There was no posting for the job or formal interview according to Dr. Wandel.  Dr. Wandel told Dr. Sharma and Dr. Ali the same.

- Dr. Sharma offered them (Drs. Wandel, Hutcheson and Berriman) a good plan, if they do not trust Dr. Ali's clinal skill and they do not trust all these recommendation letters, they can test me on the floor for few months.  Still, Dr. Hutcheson refused.
- Drs. Wandel and Hutcheson asked Dr. Ali many times to support the resident by giving lectures.

49.     As part of the process we have to go through EEOC, where we submitted our complaint, their response and our feedback to their critiques.

### INJUNCTIVE RELIEF

50.     Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

51.     Dr. Ali has completed all aspects of the arrangement he made with WMC-NYMC to join their residency program.  WMC-NYMC, despite having accepted and praised his contributions to the prestige of the institution, has refused to provide Dr. Ali with the promised residency program, and instead place unreasonable and discriminatory hurdles before him.

52.     Withholding the placement in the residency program is being done maliciously and with discriminatory animus with the direct intent and result of making it difficult for Dr. Ali to advance his education, to advance his professional development and to maximize through his life his professional standing and earning potential.

53.     Accordingly, Dr. Ali has earned and is entitled to a residency position.

## VIOLATION OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000 *ET*

## *SEQ.*

54.     Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

55.     The actions and omissions of the Defendants WMC-NYMC in discriminating and retaliating against the Plaintiff Dr. Ali violated his rights as a secured by the Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq. and as a result he was damaged.

## VIOLATION OF NEW YORK HUMAN RIGHTS LAW AND NEW YORK

## EXECUTIVE LAW § 296 *ET SEQ.*

56.     Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

57.     The actions and omissions of the Defendants WMC-NYMC in discriminating and retaliating against the Plaintiff Dr. Ali violated his rights as a secured by the under the New York State Human Rights Law New York Executive Law § 296 *et seq.*

58.     Such conduct by Defendants has damaged Dr. Ali in a substantial amount, to be determined at trial.

WHEREFORE, Plaintiff requests that judgment be entered in his favor and against Defendants as follows:

a.  Injunctive relief and/or declaratory judgment;

b.  All back pay and back benefits to which he has been deprived;

c.  Compensatory damages for the emotional harm the Plaintiff suffered as a result of the discrimination and retaliation;

d. Punitive damages for the outrageous, discriminatory and retaliatory actions of the defendants that discriminated and retaliated against the plaintiff;

e. Costs;

f. Pre- and post-judgment interest;

g. Attorney's fees; and

h. Any and all other relief this court deems just and appropriate.

## JURY TRIAL IS DEMANDED

Dated: New York, New York,
        September 6, 2019

|  |  | **ROBERT W. SADOWSKI PLLC** |
|---|---|---|
|  |  |  |
|  | By: | s/ Robert W. Sadowski |
|  |  | Robert W. Sadowski<br>800 Third Avenue, 28th Floor<br>New York, New York 10022<br>Telephone: (646) 503-5341<br>rsadowski@robertwsadowski.com |