UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------- X
AMRO ALI, M.D.,                          :
                                         :
           Plaintiff,                  :   Civil Action No. 19-CV-8324-DLC-DCF
    v.                                   :
                                         :   **DEFENDANTS'**
WESTCHESTER MEDICAL CENTER               :   **RULE 56.1 STATEMENT**
and NEW YORK MEDICAL COLLEGE,            :
                                         :
           Defendants.                 :
----------------------------------------- X

      Defendants Westchester Medical Center and New York Medical College (together, "Defendants"), by and through their attorneys, Meyer, Suozzi, English & Klein, P.C., as and for their statement of material facts pursuant to Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, hereby set forth the following material facts as to which they contend there is no genuine issue to be tried:

**A.**    **The Parties**

    1.    Westchester Medical Center is owned and operated by the Westchester County Health Care Corporation, a public benefit corporation of the State of New York. (N.Y. Public Authorities Law § 3300 *et seq.*)

    2.    New York Medical College ("NYMC") is a not-for-profit American medical school located on a 565-acre suburban campus shared with WMC in Westchester County, New York.

    3.    Plaintiff Amro Ali, M.D. ("Plaintiff"), who was born in 1971, is Egyptian by nationality. (Millus Decl. Ex. C pp. 8-9; Millus Decl. Ex. I.)[1]

---

[1] The term "Millus Decl." refers to the "Declaration of Paul F. Millus in Support of Defendants' Motion for Summary Judgment," dated October 30, 2020.

4.       Plaintiff is a graduate of Alexandria University in Alexandria, Egypt, where he received his medical degree in 1995. Thereafter, he continued his studies at Alexandria University, receiving a Master's degree in 2001 and performing an Ophthalmology residency at the Alexandria Eye Center between 2000 and 2002. (Millus Decl. Ex. C.)

5.       The United States Medical Licensing Examination ("USMLE"), which is taken in three "Steps," must be successfully completed by any candidate seeking to practice medicine in the United States. (Millus Decl. Ex. H pp. 13, 34.) In 1998, while still in Egypt, Plaintiff passed Steps 1 and 2 with scores below 80. A passing score at the time he took the exams was 75. Plaintiff did not take *and* pass Step 3 until April 2018. Plaintiff had previously sat for Step 3 of the USMLE and failed in April 2017. (Millus Decl. Ex. D pp. 45-46, 117-18, 173.)

**B.**     **The Complaint**

6.       Plaintiff's Complaint contains three causes of action: (1) "Injunctive Relief," which is actually just a remedy; (2) age and national origin discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and, presumably, the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.*; and (3) age and national origin discrimination under N.Y. Executive Law § 296. None of the paragraphs alleging these violations mention the basis for the claims, and only in his Preliminary Statement in paragraph 1 does he mention age and "national origin," which he does without ever specifying what nationality he identifies with as the foundation of his national origin discrimination claim. (Millus Decl. Ex. A.)

**C.**     **Plaintiff's Professional Career From 2002-2015**

7.       From 2002 through 2015, Plaintiff participated in various fellowships in the field of Ophthalmology in New York, Detroit, and Portland, including an internship in general surgery at North Shore University Hospital from 2002 to 2003, and he served as an Associate Research

Scientist from June 2011 to December 2015, when he joined NYMC as a Clinical Instructor. (Millus Decl. Ex. C.)

8. After arriving in the United States, Plaintiff started as a general surgery intern in 2002 as a bridge to pursue his interest in Ophthalmology. He then pursued a series of fellowships in the field of Ophthalmology, where he hoped to improve his skills and his chances of obtaining a residency in Ophthalmology. (Millus Decl. Ex. D pp. 16-17.)

9. While performing his Neuro-Ophthalmology fellowship at Henry Ford Healthcare between 2003 and 2004, Plaintiff applied for a residency position and did not receive it, conceding that Ophthalmology is "very competitive" and requires a "strong CV." (Millus Decl. Ex. D pp. 17-19, 22.)

10. Plaintiff was of the belief that improving his CV with fellowships in the field of Ophthalmology was his best route to obtaining an Ophthalmology residency, conceding that, even if performing fellowships is not required for obtaining a residency in Ophthalmology, it was the better "course of action" for him. (Millus Decl. Ex. D pp. 21-22.)

11. In 2007, Plaintiff began another fellowship in Ophthalmology at the New York Eye and Ear Infirmary ("N.Y. Eye & Ear"). He again applied for a residency program and did not obtain one, stating "[t]his is a very high[ly] competitive program. They didn't even take people from the Ivy League." (Millus Decl. Ex. D pp. 23-25, 26.)

12. After being unsuccessful in obtaining a residency position while at N.Y. Eye & Ear, Plaintiff was asked to stay one more year, and that the following year he "should be [sic] have a better chance at a match." Plaintiff declined the invitation and moved on to the Casey Eye Institute in Oregon. (Millus Decl. Ex. D pp. 28-29.)

13. Plaintiff did not believe he was the victim of discrimination on the basis of either his national origin or age when he failed to obtain a residency while at N.Y. Eye & Ear, claiming

3

"[b]ecause at that time I didn't work for free for three years. I didn't get verbal or written promises." (Millus Decl. Ex. D pp. 29-30.)

14.    While at the Casey Eye Institute, Plaintiff again applied for a residency position and was unsuccessful. When asked if he believed that anyone at the Casey Eye Institute had possibly discriminated against him on the basis of his age or national origin, Plaintiff testified "No, first of all, people in Oregon, they were very supportive, people very nice." (Millus Decl. Ex. D pp. 34-37.)

15.    At the same time that he worked at the Casey Eye Institute, Plaintiff also performed research as an Associate Research Scientist at New York University. That was until 2015, when he met Dr. Sansar Sharma, a Ph.D. in Physiology and professor of Ophthalmology, Cell Biology and Anatomy at NYMC. (Millus Decl. Ex. D pp. 38-40, 65; Millus Decl. Ex. E pp. 6-8.)

16.    Plaintiff joined NYMC's faculty in February 2016, after being approved for a position, but he began providing his volunteer services in or around December 2015. (Millus Decl. Ex. D pp. 65, 78.)

17.    When Plaintiff and Dr. Sharma first met, Plaintiff explained his history, provided Dr. Sharma with his CV, and told Dr. Sharma his USMLE scores, which he was told were "low." (Millus Decl. Ex. D pp. 67-68.)

18.    Plaintiff was well aware that the position being discussed with Dr. Sharma was unpaid. (Millus Decl. Ex. D pp. 68-69, 73-74.)

19.    There is nothing in writing before Plaintiff began his volunteer service for NYMC that stated that Dr. Sharma or Dr. Thaddeus Wandel, who was employed by NYMC as Resident Training Program Director, ever promised Plaintiff that, if he performed well in the volunteer position, he would receive a residency position. (Millus Decl. Ex. D p. 72.)

20. As for any promise that is alleged to have been made orally by Dr. Sharma to Plaintiff that he would obtain a residency position if he performed well as a volunteer, Plaintiff admitted that he had no idea whether Dr. Sharma even had the authority to make such a promise, stating "I don't know what he is power to do or not to do." (Millus Decl. Ex. D pp. 86-87.)

D.   **Plaintiff Attempts To Obtain a Residency Position While At NYMC**

21. Plaintiff applied for, but was not chosen for, a "non-match" residency position. (Millus Decl. Ex. C pp. 72-106, 118-19.)

22. Non-match residency positions are filled by committee, and the decision makers receive input from many sources. (Millus Decl. Ex. H pp. 17-23, 27-28, 45-48, 54-57; Millus Decl. Ex. F pp. 14-16, 25-29, 33-35; Millus Decl. Ex. G p. 32.)

23. The individual who was chosen for the residency position, Dr. Sameer Al-Shweaki, is Jordanian and went to medical school in Jordan. (Millus Decl. Ex. D pp. 127-29, 136-37, 197.)

24. Dr. Al-Shweaki had excellent scores on Steps 1 and 2 of the USMLE and passed Step 3 of the USMLE as well. (Millus Decl. Ex. H pp. 19, 22, 54-56; Millus Decl. Ex. G p. 28.)

25. Dr. Al-Shweaki completed an internship at a hospital affiliated with Johns Hopkins in Baltimore. (Millus Decl. Ex. H p. 55.)

26. Dr. Al-Shweaki had worked with, and was recruited by, Dr. Kelly Hutcheson, who, at the time, was the new Director of Ophthalmology at WMC and Chair of Ophthalmology at NYMC. (Millus Decl. Ex. D pp. 121, 197; Millus Decl. Ex. G pp. 26-29; Millus Decl. Ex. H pp. 28, 56-57; Millus Decl. Ex. E pp. 50-51.)

27. Plaintiff believes he is more qualified than Dr. Al-Shweaki because of Dr. Al-Shweaki's alleged lack of publications and grant procurement, but he concedes that Dr. Al-

5

Shweaki had an advantage in that he "had the pleasure to work with the Chairman [Dr. Hutcheson]." (Millus Decl. Ex. D pp. 127-28.)

28. When Plaintiff learned that Dr. Al-Shweaki would be receiving the residency position he met with Dr. Hutcheson. He never told her he felt he was the victim of discrimination. Instead, he claimed that he had allegedly been promised the position. (Millus Decl. Ex. D pp. 137-38.)

29. Although Plaintiff believes he was wrongfully required to pass Step 3 of the USMLE prior to beginning a residency because he went to a foreign medical school, Plaintiff concedes that not all students at U.S. medical schools are necessarily American, and that not all students at foreign medical schools are necessarily non-American (Millus Decl. Ex. D pp. 107-09, 154-55), and Plaintiff has no proof that American graduates of foreign medical schools were, or would be, treated differently than non-American graduates of foreign medical schools (Millus Decl. Ex. D pp. 134, 154-57).

30. According to Plaintiff, Dr. Wandel jokingly questioned Plaintiff's ability to wake up in the middle of the night if he were a resident, which Plaintiff considered to be a reference to his age, and which, according to Plaintiff, was repeated to Dr. Sharma. (Millus Decl. Ex. D p. 142-43.)

31. According to Plaintiff, Dr. Wandel also said to Dr. Sharma that Plaintiff looks older than he really is. (Millus Decl. Ex. D p. 142.)

32. This is in spite of the fact that Dr. Wandel was one of the individuals who was actively trying to help Plaintiff achieve his dream of an Ophthalmology residency. (Millus Decl. Ex. E pp. 24-25, 46-48; Millus Decl. Ex. H pp. 18-23, 32-34, 50-52; Millus Decl. Ex. G p. 26.)

33. Other than the alleged requirement that he pass Step 3 of the USMLE and Dr. Wandel's two purportedly discriminatory remarks, Plaintiff has no other proof that Defendants

ever did or said anything to him suggesting he was the victim of discrimination based on his age or national origin, including, but not limited to, any sort of posting, cartoon, or email he thought was discriminatory towards him on the basis of his age or national origin. (Millus Decl. Ex. D pp. 149-151.)

Dated:   Garden City, New York
         October 30, 2020

                                        MEYER, SUOZZI, ENGLISH & KLEIN, P.C.


                                        By:      *s/ Paul F. Millus*
                                              Paul F. Millus, Esq.
                                              Daniel B. Rinaldi, Esq.
                                        990 Stewart Avenue, Suite 300
                                        P.O. Box 9194
                                        Garden City, New York 11530-9194
                                        (516) 741-6565
                                        *Attorneys for Defendants*

4452944