# EXHIBIT 4

```
 1

 2    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 3    ----------------------------------------X
      AMRO ALI, M.D.
 4
                          PLAINTIFF,
 5

 6      -against-          No.: 19-CV-08324
                           (DLC)(DCF)
 7
      WESTCHESTER MEDICAL CENTER and NEW YORK
 8    MEDICAL COLLEGE,

 9                         DEFENDANTS.
      ----------------------------------------X
10

11                   DATE:  September 30, 2020

12                   TIME:  10:44 A.M

13

14

15          REMOTE DEPOSITION of the Defendant,

16    by THADDEUS WANDEL, taken by the Plaintiff,

17    pursuant to a Notice and to the Federal Rules

18    of Civil Procedure, held via video

19    teleconference, before Diane Buchanan, a

20    Notary Public of the State of New York.

21

22

23

24

25
```



1

2    A P P E A R A N C E S:

3

     ROBERT W. SADOWSKI, PLLC
4    Attorneys for the Plaintiff
          800 Third Avenue
5         New York, New York  10022
          BY:  ROBERT SADOWSKI, ESQ.
6

7

     MEYER SUOZZI ENGLISH & KLEIN, P.C.
8    Attorneys for the Defendants
          1350 Broadway
9         New York, New York 10018
          BY:  PAUL MILLUS, ESQ.
10

11   ALSO PRESENT:  Newman Hoffman
                    Daniel Rinaldi
12                  Amro Ali

13                      *       *       *

14

15

16

17

18

19

20

21

22

23

24

25



1

2        F E D E R A L   S T I P U L A T I O N S

3

4

5        IT IS HEREBY STIPULATED AND AGREED by and

6    between the counsel for the respective

7    parties herein that the sealing, filing and

8    certification of the within deposition be

9    waived; that the original of the deposition

10   may be signed and sworn to by the witness

11   before anyone authorized to administer an

12   oath, with the same effect as if signed

13   before a Judge of the Court; that an unsigned

14   copy of the deposition may be used with the

15   same force and effect as if signed by the

16   witness, 30 days after service of the

17   original & 1 copy of same upon counsel for

18   the witness.

19

20        IT IS FURTHER STIPULATED AND AGREED

21   that all objections except as to form, are

22   reserved to the time of trial.

23

24             *     *     *     *

25



```
 1              THADDEUS WANDEL
 2   T H A D D E U S   W A N D E L , called as a
 3   witness, having been first duly sworn by a
 4   Notary Public of the State of New York, was
 5   examined and testified as follows:
 6   EXAMINATION BY
 7   MR. SADOWSKI:
 8        Q.   Please state your name for the
 9   record.
10        A.   Thaddeus Wandel.
11        Q.   What is your address?
12        A.   100 Crow Hill Road, Mount Kisco,
13   New York 10549.
14        Q.   Good morning.  My name is Robert
15   Sadowski.  I represent plaintiff in an action
16   against New York Medical College and
17   Westchester Medical Center, Dr. Amro Ali.
18   Let me ask you:  Have you ever been deposed
19   before?
20        A.   Yes.
21        Q.   How many times?
22        A.   Under ten, more than six.
23        Q.   Okay.  Let's just refresh the
24   rules.  The most important rule is that we
25   not talk over one another so that if you
```



```
1                    THADDEUS WANDEL

2     could please wait until I finish asking my

3     question before you begin answering it so

4     that the court reporter can take down both of

5     what we are saying because she cannot take

6     down both of us talking at the same time.  At

7     certain points during the deposition counsel

8     for the defendants may object.  You are still

9     required to answer the question unless

10    counsel directs you not to answer.  If at any

11    time you want to take a break, we will do

12    that.  I just ask that if there's a pending

13    question you answer that question before we

14    break.  If at any time you don't understand

15    my questions, please let me know.  If you do

16    answer it we will assume you understand my

17    question and you can answer it

18    comprehensibly.  Do you understand the

19    instructions I've given you?

20         A.   Yes.

21         Q.   Okay.  Are you represented today by

22    counsel?

23         A.   Yes.

24         Q.   And who is that?

25         A.   Mr. Newman Hoffman for New York
```



```
 1                    THADDEUS WANDEL

 2    Medical College and present gentlemen who is

 3    working with me.  I have trouble with names

 4    at times.

 5         Q.   Okay.  Is that Mr. Millus?

 6         A.   Yes.

 7         Q.   Are you employed by New York

 8    Medical College?

 9         A.   Yes.

10         Q.   And what is your position?

11         A.   As the program, resident training

12    program director.

13         Q.   And how long have you held that

14    position?

15         A.   Five years.

16         Q.   And are you employed by New York

17    Medical College?

18         A.   Now, yes.

19         Q.   What is your position at

20    Westchester Medical College?

21              MR. MILLUS:  New York.

22         A.   New York Medical College.  I am now

23    the Ameritas program director.

24         Q.   Just so I understand, you are the

25    resident training director at New York
```



1              THADDEUS WANDEL

2    Medical College, correct?

3         A.   Yes, that was as of 2016.

4         Q.   And you are Ameritas training

5    director at WMC, Westchester Medical Center?

6         A.   New York Medical College.

7         Q.   So, does that indicate that you are

8    retired?

9         A.   Yes.

10        Q.   And are you employed at all by

11   Westchester Medical Center?

12        A.   The money that I receive on a New

13   York Medical College paycheck I believe

14   originates at the Westchester Medical Center.

15        Q.   How did you come to that

16   understanding?

17        A.   There is an affiliation contract

18   between Westchester Medical Center and New

19   York Medical College.  I believe at the time

20   2016 we are discussing this, the money was

21   coming directly in a paycheck from

22   Westchester Medical Center by way of federal

23   money.  The more recent paycheck has money

24   going from Westchester Medical Center to New

25   York Medical College, so I receive it on the



```
 1                  THADDEUS WANDEL
 2   New York Medical College paycheck.
 3        Q.   When did you retire from residence
 4   training at New York Medical College?
 5        A.   About three months ago.
 6        Q.   As Ameritas training director, what
 7   are your current duties and responsibilities
 8   at this time at the medical college?
 9        A.   I'm in charge of the wellness
10   program and acting as a liaison between the
11   residents and the current program director
12   and chairman.
13        Q.   Who is the current program director
14   at New York Medical College?
15        A.   Dr. Sankara Mahesh.
16        Q.   What field of medicine did you
17   practice?
18        A.   In ophthalmology.  I'm the glaucoma
19   specialist.
20        Q.   Do you know a doctor by the name of
21   Amro Ali?
22        A.   Yes.
23        Q.   How did you first come to know Dr.
24   Ali?
25        A.   By way of Dr. Sharma, Dr. Sharma
```



```
1                    THADDEUS WANDEL
2    who is the head of the resident of the
3    ophthalmology research branch of the
4    ophthalmology department told me that he had
5    recruited Dr. Amro to help develop a research
6    program in ophthalmology at New York Medical
7    College.
8         Q.   When was that?
9         A.   I believe it was approximately
10   October of 2015.  I may be off on the date
11   but not by too much.
12        Q.   Okay.  When did you first meet Dr.
13   Ali?
14        A.   I am not clear whether I met him
15   over in Dr. Sharma's laboratory at New York
16   Medical College or whether he introduced me
17   to him over at the Westchester Medical
18   Center, but it was in the context of hi, this
19   is Dr. Amro, he's going to help me develop a
20   research program.
21        Q.   Why did Dr. Sharma need someone to
22   help develop the research program?
23        A.   Dr. Sharma was having issues
24   getting NIH grant money to maintain a
25   research program in his area of
```



```
 1              THADDEUS WANDEL
 2   ophthalmologic nerve regeneration.  So, he
 3   was looking for a new person to create new
 4   ideas for research in ophthalmology.
 5        Q.   Let me show you an exhibit.
 6              (Wandel Exhibit 1, January 14, 2015
 7         letter, marked for identification, as of
 8         this date.)
 9        Q.   Do you see this, what I'm showing
10   you is marked Wandel Exhibit 1.  You see this
11   is Exhibit 1, it's the logo that is the
12   ACGME.  What does that stand for?
13        A.   Accreditation Counsel for Graduate
14   Medical Education.
15        Q.   What does that body do?
16        A.   It evaluates training, resident
17   training programs nationally to ensure
18   uniform quality of the training, to ensure
19   patient safety.  The organization was
20   developed to promote patient safety and
21   training standards for American residents.
22        Q.   Okay.  Now you see this letter it's
23   dated January 14, 2015, addressed to you as
24   program director, Westchester Medical Center.
25   And now I'm going to scroll down and this
```



```
 1                  THADDEUS WANDEL
 2    first subject heading resolved citations, the
 3    review committee determined that the
 4    following citations have been resolved.
 5    Scholarly activities since 11/1/2012, status
 6    resolved.  Do you see this citation
 7    resolution?
 8         A.   Yes.
 9         Q.   Okay.  Can you tell me was there an
10    issue with ACGME over the scholarly
11    activities at New York Medical College and at
12    the Westchester Medical Center program?
13         A.   Yes.
14         Q.   What problem?
15         A.   We were not active in scholarly
16    activities and basic research as much as the
17    ACG meeting would like to see us.
18         Q.   And is that one of the reasons that
19    Dr. Ali was recruited by Dr. Sharma?
20         A.   Yes.
21         Q.   I'm showing what is marked Sharma.
22    Exhibit 1.  It's an e-mail chain and it
23    starts out from Amro Ali on October 16, 2015
24    to Raymond Wong, Tad Wandel, Sansar Sharma.
25    Ophthalmology is the finest art of medicine,
```



```
 1                    THADDEUS  WANDEL
 2    addressed to you as well as Dr. Sharma and
 3    Dr. Wong.  And it states this letter is part
 4    of my formal application to PGY2, the
 5    residency position available at the
 6    department of ophthalmology.  The enclosed
 7    c.v. information about my past experiences in
 8    addition to my SF application.  However, I
 9    would like to bring to your kind attention
10    certain points that I believe demonstrate how
11    the background precisely fits your ongoing
12    needs.  When you received this e-mail, Dr.
13    Wandel, did you review it?
14         A.   Yes.
15         Q.   Okay.  Did you see the enclosed
16    c.v. information and Dr. Ali's past
17    experiences and his SF application?
18         A.   Yes.
19         Q.   The SF application that stands for
20    San Francisco match?
21         A.   Yes.
22         Q.   And the PGY2, that's the
23    ophthalmology residency program second year?
24         A.   No, that would be program, he would
25    have an internship which is PGY1.  And then
```



```
 1              THADDEUS WANDEL
 2   the first year of training in ophthalmology
 3   is PGY2.
 4        Q.   Okay.  So, at this time included in
 5   the San Francisco match application you would
 6   have seen his scores for the scores for step
 7   1 and 2 of the USMLE?
 8        A.   Yes.
 9        Q.   Okay.  And USMLE stands for what?
10        A.   I believe something like U.S.
11   medical.  I'm not sure of the last letter.
12        Q.   Would it be licensing exam?
13        A.   Yes.
14        Q.   And also in the c.v. you would have
15   seen the various training and fellowships
16   that Dr. Ali had attended?
17        A.   Yes.
18        Q.   And in that package would have also
19   included letters of recommendation from his
20   supervisors in his various past fellowship
21   programs?
22        A.   Yes.
23        Q.   And you would have seen that he was
24   a graduate of the medical school at the
25   Alexandria School in Egypt?
```



1                 THADDEUS WANDEL

2        A.   Yes.

3        Q.   Dr. Wandel, I'm showing you what

4   has been marked as Ali Exhibit 5.  This is

5   from New York Medical College and it is

6   addressed to Dr. Ali and signed by the Dean

7   of the School of Medicine Douglas Miller.

8   And have you ever seen this document before?

9        A.   I don't recollect that I ever saw

10  that.

11       Q.   Okay.  You do understand that Dr.

12  Ali was offered a full-time faculty position

13  at the New York School of Medicine?

14       A.   I don't recollect immediately but

15  it would be appropriate.

16       Q.   And it would be appropriate because

17  in order to apply for grants such as NHI

18  grants he would need to be a full-time

19  faculty member of the School of Medicine,

20  correct?

21       A.   Yes.

22       Q.   What did you understand Dr. Ali's

23  duties and responsibilities to be as a

24  full-time faculty member at New York Medical

25  College?



1           THADDEUS WANDEL

2           A.   His requirements would be totally

3    under Dr. Sharma's supervision and involved

4    working at in Dr. Sharma's laboratory.

5           Q.   Okay.  And would that be doing

6    research and publishing peer reviewed

7    articles?

8           A.   Yes.

9           Q.   And if I represented to you that

10   Dr. Ali produced eight articles for

11   publication; do you recall that?

12          A.   I'm not aware of the exact number.

13   But I was aware that he did produce peer

14   review articles.

15          Q.   Okay.  And were you listed as a

16   co-author on those articles?

17          A.   I believe on one, perhaps, two I

18   was listed.

19          Q.   And was Dr. Sharma listed as a

20   co-author on some of those articles?

21          A.   I would think he would be co-author

22   on all of them.

23          Q.   In addition to articles do you

24   recall that Dr. Ali submitted IRB's?

25          A.   Yes.



1                    THADDEUS WANDEL

2        Q.    How many?

3        A.    I'm not aware of the total number.

4        Q.    Did he apply for grants?

5        A.    Yes, but, again, their number and

6    to granting organization I'm not totally

7    aware of.   That was in a context over in Dr.

8    Sharma's laboratory which is physically

9    separated from the hospital by reasonable

10   walk.

11       Q.    On Dr. Ali's position as a

12   full-time faculty member for the School of

13   Medicine at New York Medical College was

14   unpaid, correct?

15       A.    I learned of that after he had

16   worked with Dr. Sharma for a time.

17       Q.    How did you learn of that?

18       A.    Dr. Sharma had some money in some

19   grant somewhere to provide some

20   reimbursement.

21       Q.    When did you learn that Dr. Ali's

22   position was unfunded?

23       A.    A couple of months after he

24   started.

25       Q.    Okay.   And how did you learn that?



1                    THADDEUS WANDEL

2          A.    I asked Dr. Sharma like how is this

3     guy putting bread on his table and Dr. Sharma

4     said that he volunteered.

5          Q.    What caused you to ask Dr. Sharma

6     how is this guy putting bread on the table?

7          A.    Curiosity.

8          Q.    If you were assuming there were

9     funds to pay Dr. Ali why would you ask how is

10    this guy putting bread on the table?

11         A.    I was just curious under what, how

12    it was that he was working in the capacity

13    that he was working.

14         Q.    Did you have some reason to believe

15    that he was working as a volunteer rather

16    than as a paid faculty member?

17         A.    Well, he's over in basic science

18    building with Dr. Sharma and I was, again,

19    just curious why he was doing what he was

20    doing.

21         Q.    When you learned that Dr. Ali was

22    working unfunded as a volunteer did you have

23    any discussions with either Dr. Ali or Dr.

24    Sharma about that arrangement?

25         A.    Yes, and Dr. Sharma felt that we



```
1              THADDEUS WANDEL

2   might favorably present him to the group that

3   chooses residents in a favorable manner.

4       Q.   And one of those people who decides

5   who would be become residents would be

6   yourself, correct?

7       A.   Yes, I'm part of the committee that

8   chooses residents.

9       Q.   Okay.  Did you or Dr. Sharma give

10  Dr. Ali assurances that if he completed his

11  responsibilities to help develop the research

12  program he would be rewarded in the end of

13  some period by a residency ophthalmology?

14      A.   I don't think we ever used the word

15  assurances guarantee.  I think we used the

16  words he would be presented favorably and

17  have the best chance possible of becoming a

18  resident.

19      Q.   Are those the words you used, the

20  best chance possible?

21      A.   Or similar words.

22      Q.   Okay.  And what did you understand

23  that to mean?

24      A.   Ophthalmology residency is a very

25  competitive position and because of Dr.
```



```
 1                THADDEUS WANDEL
 2   Amro's poor step one scores he wouldn't pass
 3   the first screening evaluations for becoming
 4   an interviewee.  So, because of Dr. Sharma's
 5   position and mine we bypassed the first
 6   screening process and gave him access to the
 7   interview process.
 8        Q.   Okay.  The process that your
 9   speaking about is that the San Francisco
10   match?
11        A.   Yes.
12        Q.   And did Dr. Ali go through the
13   San Francisco match process?
14        A.   Yes.
15        Q.   And did the committee select Dr.
16   Ali in the match process?
17        A.   He was picked to go through the
18   interview process.  We go from about 300 to
19   400 applicants for three positions and we cut
20   the applicant pool to about 50 for
21   interviews.  We got him through, Dr. Sharma,
22   and I got him through that first selection
23   process to be one of the 50 or so
24   interviewees.
25        Q.   And was he successful in that match
```



1              THADDEUS WANDEL

2    process?

3         A.    No.

4         Q.    Why not?

5         A.    The people who interviewed him felt

6    that he was not a strong candidate compared

7    to the others who were being interviewed.

8         Q.    Who were the interviewers?

9         A.    I believe at this time it would be

10   people like Dr. Wong, myself, Dr. Dr.

11   Zaidman, Dr. Sharma, Dr. Juechter.  And also

12   the first candidate was also interviewed

13   informally by a group of residents.  And

14   their evaluation is included in the process

15   for selection.

16        Q.    Do you recall telling Dr. Ali that

17   you couldn't rank him highly because of a

18   resident by the name of Eric Rosenberg had

19   said things that made you rank Dr. Ali lower?

20        A.    In the process of ranking the

21   applicants to put them on a final rank list

22   that is submitted to the match we evaluate

23   all of the residents at the end of each

24   interview day and then we ask a

25   representatives of the residents,



```
 1              THADDEUS WANDEL

 2    pre-selected representative to bring in their

 3    list of who they would like and how they rank

 4    the applicant pool.  And then we match what

 5    we feel are the best applicant or putting

 6    them on the rank list and we compare our list

 7    to the resident list Dr. Rosenberg was acting

 8    as a representative of the residents rather

 9    than as an individual.  And his statement

10    comes as a summary of the resident judgment

11    of their interviews with all of the

12    applicants.

13         Q.   And what did Dr. Rosenberg say to

14    you in connection with his or the groups,

15    group of residents opinion of Dr. Ali?

16         A.   That Dr. Ali would not work

17    smoothly with the group of residents compared

18    to the other people who are in the applicant

19    pool.

20         Q.   Did he use the word "smoothly"?

21         A.   To that effect.  That we are

22    interested in picking residents who are going

23    to be functioning in a team to take care of

24    complicated patients involving handoffs and

25    late morning call, variety of other stressful
```



1              THADDEUS WANDEL

2    environments which require all of the

3    residents to work very comfortably with each

4    other without any possibility of emotions or

5    feelings about each other who interfere with

6    patients safety and patient care.

7         Q.   Did Dr. Rosenberg give you any kind

8    of specific examples for his saying to the

9    effect that Dr. Ali would not smoothly work

10   in a team of residents?

11        A.   It was pointed out, I believe, by

12   Dr. Rosenberg that Dr. Ali had been many,

13   many years out from his PGY1 internship year

14   at the time of his application.

15        Q.   Well, the committee itself or you

16   yourself knew that even before Dr. Ali joined

17   the medical college, correct?

18        A.   Yes, if you review his c.v. and

19   again what we tried to do is even with issues

20   with that aspect of his training that he had

21   been many years out from his internship and

22   he had low step 1 and step 2 scores, I would

23   still give him a good shot at becoming a

24   resident by bringing him to the full

25   committees approval process.



1          THADDEUS WANDEL

2     Q.   Who are the members of the

3  committee at that period selecting the

4  residents?

5     A.   That would be the list I think I

6  provided Dr. Wong, myself, Dr. Sharma, Dr.

7  Juechter, Dr. Zaidman.

8     Q.   And you were at that time the

9  program, the residency program director,

10  correct?

11     A.   Correct.  My signature is on the

12  rank list that we submit to the computer

13  system at SF match to provide this residents.

14     Q.   Is that document in the system at

15  the medical college?

16     A.   It's archived at SF match.

17     Q.   Doesn't the medical school keep a

18  copy of that?

19     A.   No.  It's -- maybe they do.  I

20  think Regina may have a copy of that in Dr.

21  McCarrick's office.

22     Q.   Okay.  I'm going to call.

23     A.   They have to go through SF match

24  through archives.

25          MR. SADOWSKI:  I will ask for a



```
 1                 THADDEUS WANDEL
 2       copy of that ranking list.
 3       Q.   And, Dr. Wandel, what is the title
 4   of that document?
 5       A.   Match list for SF match 2016.
 6            MR. MILLUS:  If I have it, I asked
 7       and asked, we checked and checked.  I
 8       will do whatever is necessary.  I would
 9       love to produce that list, so everything
10       in my power.
11            MR. SADOWSKI:  Okay, great.
12       Q.   When you learned that Dr. Ali was,
13   his position was unfunded did you and Dr.
14   Sharma and Dr. Ali in any form discuss how
15   ultimately Dr. Ali would be rewarded for his
16   work?
17       A.   Your implication is that the reward
18   would be some guarantee for a resident
19   position.  But neither Dr. Sharma nor myself
20   were in any position to tell Dr. Ali that all
21   we could do was put him in the most favorable
22   position to be reviewed by the selection
23   committee.  And I was frankly surprised he
24   was willing to come from NYU where he did
25   have a salary I believe to volunteer.
```



1              THADDEUS WANDEL

2        Q.   Well, I think that's precisely the

3    point that it would not be reasonable for

4    someone to work, someone with Dr. Ali's

5    credentials to work somewhere for free for a

6    number of years without being given some

7    consideration that he could rely on?

8        A.   Yes, I agree.

9        Q.   Okay.

10       A.   But we never could do that.

11   Neither Dr. Sharma nor myself are in any

12   position to guarantee such a position and all

13   we can use are words like we will try, we

14   will provide you access, we will do the best

15   we can.

16       Q.   Other than through the

17   San Francisco match are positions obtained in

18   the residency program outside of the match?

19       A.   Yes, it's called that off match.

20       Q.   In fact Dr. Rosenberg entered the

21   program off match?

22       A.   Yes.

23       Q.   And a doctor by the name of --

24       A.   Wait, Dr. Rosenberg he did go

25   through the process.  He was formerly

```
 1                THADDEUS WANDEL
 2   interviewed in the same fashion that any
 3   candidate is interviewed.  So he was never
 4   guaranteed a position when he worked for his
 5   year with Dr. Sharma.  The language used by
 6   Dr. Rosenberg was identical to the language
 7   used with Dr. Amro.  And Dr. Rosenberg
 8   expressed concern to me more than once
 9   without a guarantee that he was nervous that
10   he would be left without any job at the end
11   of his working stay with Dr. Sharma.
12         Q.   Ultimately Dr. Rosenberg did
13   acquire a residency position in
14   ophthalmology, correct?
15         A.   Yes.  But he went through the
16   process I described earlier.
17         Q.   Yes, but he was not successful in
18   the San Francisco match.  He received his
19   residency position off match?
20         A.   Yes.
21         Q.   Also there was a Dr. Daniel, I
22   don't know the last name, but he also
23   received a resident, Offer?
24         A.   Daniel Offer?
25         Q.   Yes.
```



```
 1                  THADDEUS WANDEL
 2         A.   My belief is that he was through
 3    the match.
 4         Q.   Okay.  Do you know for sure one way
 5    or the other?
 6         A.   The lists are archived so they
 7    could be reviewed.  All of the lists and the
 8    resident positions that were offered are
 9    archived at SF match.  At least that's my
10    understanding.  I've had access to that in
11    the past.
12         Q.   Is there a list of residents who
13    were selected for the residency program off
14    match?
15         A.   No, but they are a few in number.
16         Q.   Let's go through.  Dr. Al Sawicki
17    he entered the residency program off match,
18    correct?
19         A.   That's correct, yes.
20         Q.   Did you interview Dr. Al Sawicki
21    before he was selected for the residency
22    program?
23         A.   Yes.
24         Q.   How?
25         A.   Skype.
```



1                    THADDEUS WANDEL

2          Q.    Did Dr. Sharma interview him?

3          A.    At that point I don't think Dr.

4     Sharma was on the committee.

5          Q.    Did the other committee members

6     interview Dr. Al Sawicki by Skype?

7          A.    Skype.

8          Q.    All of them?

9          A.    I don't remember exactly who

10    interviewed him by that mode.  So, I think

11    Dr. Hutchinson might actually know in more

12    detail who actually interviewed him.

13         Q.    And the medical college or

14    Westchester Medical Center obtained a Visa

15    for Dr. Al Sawicki?

16         A.    Obtained a what?

17         Q.    A Visa?

18         A.    Yes.

19         Q.    A resident by the name of Doss?

20         A.    There are Doss, D-O-S-S.

21         Q.    Two Doss's.  A male and female,

22    right?

23         A.    Brother and sister.

24         Q.    And they both became residents in

25    ophthalmology?



```
 1                   THADDEUS WANDEL

 2        A.   Yes.  Yes.

 3        Q.   Were either of their positions off

 4   match?

 5        A.   I think Lauren does, may have been

 6   off Match.  I can't recollect exactly.  You

 7   may have more information.

 8        Q.   Is that the male or the female?

 9        A.   That would be the girl, the woman.

10   Lauren is the woman, Linden is the male.

11        Q.   Okay.  Does family make financial

12   donations to your department?

13        A.   After --

14             MR. MILLUS:  Note my objection to

15        form.  You may answer.  Go ahead.

16        A.   After Lauren was selected it became

17   obvious that we didn't have proper equipment

18   for examination purposes and Lauren was a

19   little bit annoyed that she didn't have

20   correct equipment so she asked her father for

21   her and the other residents, some of the

22   necessary equipment, but I think it was about

23   couple of thousand dollars.

24        Q.   In the range of five thousand?

25        A.   No more than that.  And it wasn't a
```



1           THADDEUS WANDEL

2    money donation, it was equipment.

3           Q.    Who purchased the equipment?

4           A.    I'm not sure actually who purchased

5    it because it showed up in a box.  Everybody

6    dived in and took the equipment to work with

7    immediately.  It could have been her money,

8    it could have been his money.  It wasn't

9    clear exactly who paid for it, but it was the

10   small kinds of pieces of equipment that

11   easily get stolen within an unsecure clinic.

12   And, you know, we were having troubles buying

13   it through normal route.  So I think she just

14   decided to get it.  Asked her father to get

15   it.  She has certainly enough money in other

16   own account to take care of it.

17          Q.    Dr. Ali?  Did you come to

18   conclusions about his character.

19          A.    Dr. Ali is a very fine gentleman,

20   very industrious, very fine trades.

21          Q.    Would you say he's honest and has a

22   strong code of ethics?

23          A.    Yes.

24          Q.    That he met all of the expectations

25   of him in connection with the research that



```
1                    THADDEUS WANDEL
2    he was to do?
3         A.   Yes.
4         Q.   Did you see him interact with
5    others well?
6         A.   Yes.
7         Q.   Did you ever find an instance when
8    he had issues interacting with others?
9         A.   He reported to me that when he was
10   allowed to watch patients being evaluated
11   that he had an episode with Dr. Rosenberg
12   where a particular patient evaluation or
13   management was questioned by Dr. Rosenberg.
14   I considered it a relatively minor episode in
15   terms of my overall view of Dr. Amro.
16        Q.   I'm not sure I understand the
17   incident.  Was it that Dr. Ali disagreed with
18   something Dr. Rosenberg was doing or
19   determining?
20        A.   It was the other way around, I
21   believe.  Dr. Rosenberg thought Dr. Amro was
22   not taking a correct approach with a
23   discussion of management of a patient.  Dr.
24   Amro was not allowed to touch any patients
25   because of his status, but was certainly
```



1                        THADDEUS  WANDEL

2      allowed to discuss patient care.  And in an

3      episode or instance where he was observing in

4      a clinic there was a discussion where Dr.

5      Rosenberg felt that Dr. Amro's approach to a

6      patient was not as good as it could be.

7           Q.    Okay.  And who brought that to your

8      attention?

9           A.    I think Dr. Amro.

10          Q.    Okay.  So, let's go to another

11     exhibit.  I'm showing you, Dr. Wandel, what

12     is marked Sharma Exhibit 3, which is an

13     e-mail dated July 10, 2016, to you and Dr.

14     Sharma.  The subject is request for clinical

15     privileges.  Going down it says:  I'm

16     submitting these documents to support my

17     request for obtaining clinical privileges at

18     the Department of Ophthalmology.  Did you

19     receive this e-mail from Dr. Ali?

20          A.    Yes.

21          Q.    And did you sign anything, advance

22     Dr. Ali acquiring clinical privileges at the

23     Department of Ophthalmology?

24          A.    I had no objection to him observing

25     in clinic according to the requirements of



1                    THADDEUS WANDEL

2     the hospital.

3          Q.   I understand you had no objection,

4     but did you do anything to advance getting

5     Dr. Ali a license so that he could engage in

6     clinical privileges in the Department of

7     Ophthalmology?

8          A.   You mean a New York -- you need a

9     New York State medical license.

10         Q.   Correct?

11         A.   I would have my -- my goal would be

12    to help him as much as I could.  I'm not sure

13    exactly what I might have done and advance

14    that.  My understanding is that he in order

15    to practice medicine independently on his own

16    license would have to have one more year of

17    training in an ACGME approved program in

18    medicine in order to practice independently.

19         Q.   Did you submit any letters

20    requesting that Dr. Ali acquire the license

21    needed for clinical privileges at the

22    Department of Ophthalmology?

23         A.   I would have no -- I would try to

24    be as helpful as possible so whatever letters

25    might be needed, I'm sure I would have



1                    THADDEUS WANDEL

2    submitted them.  I have no exact recollection

3    but my goal would be to be as helpful as I

4    possibly could within my abilities and title.

5           MR. MILLUS:  Before your next

6        question can we take a five-minute

7        break.

8           (Whereupon, a short recess was

9        taken.)

10        Q.   I'm going to show you another

11   exhibit.  I'm showing you, Dr. Wandel, what

12   has been marked as Exhibit Ali 1 entitled New

13   York Medical College GME policy USMLE step 3.

14   USMLE step 3, that is the step 3 licensing

15   exam that allows a physician to practice

16   medicine in New York State?

17        A.   Yes.

18        Q.   And I'm showing you now New York

19   Medical College GME policy which states:  All

20   residents and fellows in NYMC sponsored GME

21   programs must pass step 3 of the USMLE by the

22   completion of the second year of their NYMC

23   program in which they are enrolled.

24   According to this policy one need not have

25   passed step 3 prior to entering the residency



1              THADDEUS WANDEL

2   program, but rather must complete step 3 by

3   the completion of the second year of the

4   residency program, correct?

5        A.   Yes.

6        Q.   And there's no exceptions in this

7   policy to differentiate between American

8   medical school graduates and international

9   medical school graduates, correct?

10       A.   Correct.

11       Q.   Showing you, Dr. Wandel, the

12  Westchester Medical Center Resident/Fellow

13  Agreement Terms of Appointment Policies and

14  Procedures 2016/2017.  Are you familiar with

15  this document?

16       A.   Not enough so that I know it by

17  heart.  I probably have rarely looked at it.

18       Q.   Okay.  Let's take a look at page 40

19  of the document.  Page 40 of the resident

20  fellow agreement states:  It is the policy of

21  the Westchester Medical Center that every WMC

22  based categorical residency training program

23  and WMC require trainees to pass step 3 of

24  the USMLE or COMLEX examination sequence

25  prior to the end of their second year of



```
 1                    THADDEUS WANDEL

 2   training.  And this statement in the contract

 3   comports with a New York Medical College

 4   policy on USMLE step 3, correct?

 5        A.   Yes.

 6        Q.   So, again, this policy statement

 7   and the contract does not differentiate

 8   between international medical school

 9   graduates and American medical school

10   graduates, correct?

11        A.   Correct.

12             (Wandel Exhibit 3, document, marked

13        for identification, as of this date.)

14        Q.   Okay.  Showing you exhibit marked

15   for identification as Wandel 3 addressed to

16   Chairperson Ray Amro Ali, December 10, 2016.

17   Is that your signature at the end of the

18   document?

19        A.   Yes.

20        Q.   What is this document?

21        A.   It's a letter of recommendation.

22        Q.   Okay.  And as you state here Dr.

23   Ali was a clinical instructor?

24        A.   Yes.

25        Q.   Okay.  And you say when you review
```



```
 1                    THADDEUS WANDEL
 2    his c.v. his fellowships, retina
 3    ophthalmology you place him on a level where
 4    he can lecture on these subspecialties.
 5    Indeed he volunteered and has started a
 6    series of lectures that will review the basic
 7    science volume 9, ocular inflammation, in our
 8    basic science course.  He has ten peer
 9    reviewed publications and a similar number of
10    posters and presentations.  Dr. Ali is a true
11    team player who excels in making his
12    co-workers feel that they are working for a
13    common goal.  He has kindness and respect for
14    others.  Was this subject submitted in
15    connection with Dr. Ali's application to
16    become an ophthalmology resident?
17         A.   Yes.
18              (Wandel Exhibit 7, letter, marked
19         for identification, as of this date.)
20         Q.   I am now showing you what has been
21    marked for identification as Exhibit Wandel
22    7.  And this is a letter to Dr. Ali dated
23    October 17, 2016.  And that bears a form of
24    your signature, correct?
25         A.   I don't see it on screen.
```



1              THADDEUS WANDEL

2      Q.   Showing you what has been marked as

3   Wandel Exhibit 7 for identification, it's a

4   letter to Dr. Ali dated October 17, 2016.

5   And it bears a form of your signature,

6   correct?

7      A.   Yes.

8      Q.   This you tell Dr. Ali I had the

9   pleasure of reviewing your application and

10  would like to invite you to interview with

11  the ophthalmology residency training program.

12  Our department will be conducting interviews

13  on Tuesday, December 6, 2016.  And then Dr.

14  Ali selected I will represent to you to

15  interview on the afternoon of December 6,

16  2016.  At the end of that interview day did

17  you collect the comments including the

18  comments from the interviewers including the

19  comments from Dr. Rosenberg?

20     A.   Yes.  Past the process.

21     Q.   And that happens all on that one

22  day October 6th?

23     A.   Yes.

24     Q.   Okay.  Thank you.

25          Now, showing you what is marked



```
1                    THADDEUS WANDEL
2    Wandel Exhibit 4.
3                  (Wandel 4, e-mail, marked for
4         identification, as of this date.)
5         Q.   An e-mail from Frederick Bierman.
6    Who is Frederick Bierman?
7         A.   He is in charge of all GME at the
8    Westchester Medical Center and is my
9    immediate boss, supervisor, the person I
10   report to.
11        Q.   Okay.  And he writes an e-mail to
12   you on December 21, 2016, to Wandel Tad and
13   here it's been tracked and delivered and the
14   e-mail to you from Dr. Bierman says:  I could
15   not locate the applicant step 3 USMLE report.
16   Do you have a copy?  I also noted that his
17   internship was in general surgery.  Was he a
18   preliminary or categorical year resident?
19   Did you receive this e-mail?
20        A.   Yes.
21        Q.   Okay.  Why did Dr. Bierman need Dr.
22   Ali's step 3 USMLE report if it's not
23   required of the contractor, the policy for
24   resident to begin their residency.
25        A.   Dr. Bierman I'm not sure where he
```



1              THADDEUS WANDEL

2    became aware of our interest in Dr. Amro as a

3    possible resident in ophthalmology but in

4    doing his due diligence Dr. Bierman noted

5    Dr. Amro's internship PGY1 year was I think

6    in 2002 or '3, but many years ago.  Dr.

7    Bierman as my overseers can was concerned

8    about patient safety and patient care in

9    relation to the long length of time between

10   Dr. Bierman between Dr. Amro having his

11   clinical experience and his application to

12   the resident training program as a market of

13   competence step 3 acting as something of a

14   quantitative tool to assess for clinical

15   competence and was wondering if he had indeed

16   taken that.

17        Q.   This e-mail from Dr. Bierman says

18   nothing about patient safety, correct?

19        A.   No, not directly.

20        Q.   In this e-mail you respond to Dr.

21   Bierman the next day December 22nd, subject

22   Amro Ali, he will take step 3 on 12/28/2016

23   internship, general surgery, PGY1, 2002,

24   2003?

25        A.   I don't see that on screen.



```
 1               THADDEUS WANDEL
 2        Q.   Did I represent that correctly?
 3        A.   I believe so.  Why don't you just
 4   scan down and let me take a look.
 5        Q.   There appears to be nothing more on
 6   the page except the Bates number NYM?
 7        A.   What were you saying it contained?
 8        Q.   Yes, I made representations that
 9   it contained an e-mail from you to Dr.
10   Bierman about Dr. Ali, he will take step 3 on
11   12/28/2016?
12        A.   Yes, and I responded to him by
13   saying when Dr. Amro's internship was.
14             MR. MILLUS:  I thought was more, I
15        didn't realize it was just one line.
16        Q.   Around this time was there a
17   resident who left the program by the name of
18   Star White?
19        A.   Yes, I do remember her.
20        Q.   When she left the program there
21   became a vacancy that opened up?
22        A.   Yes.
23        Q.   Did you consider Dr. Ali for that
24   vacancy?
25        A.   Yes.
```



1              THADDEUS WANDEL

2        Q.   And that vacancy would be outside

3   the match?

4        A.   Yes.

5        Q.   Had there been before the

6   unexpected opening when Star White left had

7   there been a plan to have Dr. Ali begin a

8   residency program on July 1, 2018?

9        A.   Well, you can't begin a residency

10  training program unless you are accepted by

11  way of the SF match process or a process

12  similar to that?

13       Q.   There's either the SF match or out

14  of match?

15       A.   Yes.

16       Q.   But in terms of actually starting

17  the program without going through an

18  acceptance process?

19       A.   Correct, correct.

20       Q.   But what I'm getting at, and let me

21  ask you this.  There are two to three

22  residency programs of residents who start

23  each year in the program?

24       A.   3.

25       Q.   And --



```
 1                  THADDEUS WANDEL
 2          A.   Between 2 and 3, yes.
 3          Q.   Between 2 and 3.  And it's possible
 4     for the school to only have one person
 5     selected through the match?
 6          A.   It rarely happens, but it can.
 7          Q.   And when Dr. Al Sawicki entered the
 8     program that was outside of the match,
 9     correct?
10          A.   Correct.
11          Q.   So that position was created for
12     him?
13          A.   No, let me see.  I am not sure what
14     that position was opened for created for as
15     you say or was a spot that was unfilled.  I'm
16     not sure on that exact point.
17          Q.   He could have entered a spot that
18     was unfilled and that's how his position was
19     created?
20          A.   Yes.
21          Q.   Showing you now what has been
22     marked Wandel 6 for identification.
23               (Wandel 6, e-mails, marked for
24          identification, as of this date.)
25          Q.   As a chain of e-mails.  Here it
```



```
 1              THADDEUS WANDEL
 2   starts off with an e-mail from Amro Ali to
 3   you.  So, here Dr. Amro is telling you in
 4   this e-mail:  Due to technical problems on
 5   the first day of U.S. step 3 exam Prometrics
 6   Center have to reschedule me and other
 7   candidates me for other dates.  I try to get
 8   the first date to comply with department
 9   expectations, no exams will be administered
10   from January 1st through 15th.  I have been
11   rescheduled by the center for January 23rd
12   and 24th.  As the earliest possible date.  I
13   hope this unexpected delay of 20 days would
14   not interfere with my chances.  Then we go
15   up.  You respond, Hi, Ali, take step 3 on the
16   earliest date one 23 - 24 will have to do.
17   There is a high likelihood that you might
18   start as soon as we learn that you passed
19   step 3 not 7/1/2018.  Is it fair to say that
20   if Dr. Ali passed step 3 he would start or
21   fill the vacancy in the residency program
22   created by Star White's leaving?
23        A.   You have to look at the words high
24   likelihood.  So, I'm never saying that it's a
25   guarantee.  I'm saying there's a high
```



1              THADDEUS WANDEL

2    likelihood.

3         Q.   And then you put at the end of that

4    sentence, you put a qualifier not 7/1/2018?

5         A.   Yes, that would be off match.

6         Q.   Yes.  So, he otherwise could have

7    gotten a residency position off match on July

8    1, 2018?

9         A.   High likelihood.

10        Q.   That's 7/1/2018 date that was also

11   a high likelihood in your words?

12        A.   I would believe the high likelihood

13   refers to immediate and July 1st.

14        Q.   Okay.  Did Dr. Ali deliver to Dr.

15   Sharma and the Department of Ophthalmology

16   his commitment to the department to advance

17   publication and research?

18        A.   Yes.

19        Q.   Prior to the opening of the vacancy

20   created by Star Whites leaving, did anyone

21   express to you that Westchester Medical

22   Center was not interested in Dr. Ali for a

23   residency position because of board scores?

24        A.   I'm not sure exactly in what time

25   frame we are talking about, but when I



1              THADDEUS WANDEL
2    discussed Dr. Amro's candidacy for the
3    position with my superior Dr. Bierman his
4    concern was related to the length of time
5    that has passed between Dr. Amro's internship
6    in 2002 and when he would be assuming duties.
7    So, his capabilities in terms of day-to-day
8    patient care, patient safety were brought to
9    my attention, I had been focused primarily on
10   Dr. Amro's research capability.  And I didn't
11   appreciate the perspective that Dr. Bierman
12   had for maintaining the quality and care in
13   the hospital in his position as the head of
14   GME.
15        Q.   Was Dr. Bierman's concern about the
16   time period between Dr. Ali's surgical
17   residency and application for residency
18   position had anything to do with Dr. Ali's
19   age?
20        A.   Not as a specific factor, no.
21        Q.   Well, generally the length of time
22   2002 to 2003 and now applying for a position
23   in 2016 that number of years did that also
24   reflect on Dr. Ali's age?
25        A.    In general.  SF match maintain some



1                    THADDEUS WANDEL

2      records on applications, gaps in training.

3      And a gap in training more than a couple of

4      years between the PGY1 year and the

5      initiation in theory of a residency training

6      program in the PGY2 year if that's more than

7      two or three years you are concerned about

8      the capability of the individual to be able

9      to deal with complex medical issues that are

10     part of management in the residency training

11     program.

12          Q.   Well, certainly if Dr. Ali was

13     hired everyone was well aware from his

14     package of credentials when his surgical

15     training had occurred in 2002 and 2003; isn't

16     that correct?

17          A.   Dr. Amro came in at Dr. Sharma's

18     behest to work, develop a resident, a

19     research program.  He wasn't exactly hired,

20     he volunteered his time.  So, that, you know,

21     it's a we were not focused on his clinical

22     capabilities as much as his research

23     capabilities.  He was suitable certainly to

24     work on research capacity, but Dr. Bierman

25     did make us aware he might have issues in



1              THADDEUS WANDEL
2    terms of clinical capability.
3         Q.   Dr. Ali had had a fellowship in
4    Uveitis at New York Eye and Ear Infirmary,
5    correct?
6         A.   Yes.
7         Q.   And in connection with that he saw
8    many patients in that clinic, correct?
9         A.   I'm sure.
10        Q.   And he had other fellowships, Casey
11   Eye Institute, The Ford Institution, where he
12   had clinical responsibility, correct?
13        A.   Yes.  I am not sure though in that
14   capacity how much he was actually involved in
15   writing orders, discussing issues with
16   patients, or management of co, what are
17   called, morbities, high blood pressure, heart
18   disease and so forth.
19        Q.   Did anyone ever tell you that Dr.
20   Ali lacked clinical skills?
21        A.   No, not specifically.
22        Q.   Dr. Wandel, do you have any
23   recollection whatsoever of being on a
24   telephone call or in person that WMC would
25   reward Dr. Ali a residency position in



1                    THADDEUS WANDEL

2    exchange for his contribution and research

3    work for the department?

4         A.   No.   In fact everything I can

5    remember in all context of conversation had

6    to do with being very careful about saying we

7    will try as hard as we can as opposed to

8    guaranteeing him a position.

9              MR. SADOWSKI:   Let break for five

10        minutes.

11             (Whereupon, a short recess was

12        taken.)

13        Q.   I'm going to go back to an earlier

14   document.   I've taken us back to Wandel 4 for

15   identification.   This is Mr. Bierman's e-mail

16   to you asking for a copy of Dr. Ali's step 3

17   report.   Nowhere in this e-mail does Dr.

18   Bierman say anything about patient safety or

19   the time delay between Dr. Ali's preliminary

20   or year of resident; is that correct?

21        A.   Correct.

22        Q.   And here we are gone back to Wandel

23   Exhibit 5 for identification.   It's in this

24   e-mail that you tell Dr. Bierman his -- the

25   internship general surgery PTY1 was 2002 to



```
 1              THADDEUS WANDEL
 2   2003, correct?
 3       A.   Yes.
 4       Q.   Showing you what is marked
 5   Hutchinson Exhibit 2 for identification which
 6   is an e-mail from Dr. Ali to Dr. Hutchinson
 7   on which you are CC'd as well as Dr. Sharma.
 8   I notice on here that your subspecialty is
 9   glaucoma and that Dr. Ali had research funded
10   by the glaucoma foundation for work in ocular
11   exfoliation glaucoma.  Were you aware of that
12   research?
13       A.   Actually I wasn't.  I know they
14   emphasize on that disease.  I didn't realize
15   Dr. Amro ever received money for it.
16       Q.   How common is it for individuals to
17   receive money from the glaucoma foundation?
18       A.   I don't know the numbers on
19   applications versus the money receipt.
20       Q.   In the paragraph commencing, I got
21   my formal interview Dr. Ali writes, I got my
22   formal interview in the Department of
23   Ophthalmology in November 2016 and I have
24   been offered the position as PGY2 in April
25   2017 based on primary offer and acceptance of
```



THADDEUS WANDEL

1       this position.  I completed all of the

2       prerequisites at Metropolitan Hospital

3       including medical and other courses waiting

4       for step 3 results.  I also started to shadow

5       the residents to get familiar with the record

6       system GME office.  It was at your direction

7       that Dr. Ali commence work at Metropolitan

8       Hospital, correct?

9            A.   I suggested that it would be

10      helpful for him to shadow the residents, yes.

11           Q.   Wasn't that a direction of yours?

12           A.   Yes, but it was not an order.

13           Q.   Did you suggest that in advancement

14      of him receiving a residency position?

15           A.   Yes, I thought, again, I was trying

16      to be as helpful as I could to advance his

17      becoming a resident within the context of his

18      credentials that he provide in his c.v. and

19      to the extent I can help I'm glad to, but,

20      again, I am not in the position to guarantee

21      a post since there is a process that an

22      applicant has to go through that's monitored

23      by the chair of my department and by the head

24      of the GME office and their overview is a



```
 1              THADDEUS WANDEL
 2   guarantee that whoever comes into the program
 3   is a qualified person who has met their
 4   standards for patient care and safety.
 5        Q.   In June 2018 did you have a meeting
 6   with Dr. Hutchinson, yourself, Dr. Bierman
 7   and Dr. Sharma regarding Dr. Ali?
 8        A.   Yes.
 9        Q.   And was Michelle Hodges at that
10   meeting?
11        A.   I believe she was, if she is
12   recorded as being present I'm sure she was
13   there.
14        Q.   Okay.  What is her role at
15   meetings?
16        A.   She is the executive secretary for
17   Dr. Hutchinson who was the chair of the
18   Department of Ophthalmology and she was
19   probably there to provide notes of the
20   meeting, minutes of the meeting.
21        Q.   Did you see her taking notes for
22   minutes of the meeting?
23        A.   She was probably behind me to
24   decide, so I probably didn't see her
25   specifically or looking for her.
```



1              THADDEUS WANDEL

2        Q.   Would she have any reason to be at

3   the meeting other than to be the note taker?

4        A.   I am not sure since she was

5   probably there at Dr. Hutchinson's behest.

6   So, I am not aware of why Dr. Hutchinson

7   might want her to be there.

8        Q.   Showing you now an exhibit that's

9   been marked at the bottom as Sharma 17,

10  Wandel 11.  And it is an e-mail from Dr. Ali

11  to you cc Dr. Sharma.  It says Dr. Wandel

12  thanks for your time, I was very disappointed

13  with hiring another candidate without

14  offering me a fair chance to present my work

15  and c.v. which I achieved over years of

16  practice and research in USA, especially I

17  have been promised the chance before and I

18  have been accepted by the department and CME

19  office.  There is another candidate, is that

20  a reference to Dr. Al Sawicki?

21       A.   Yes.

22       Q.   It goes on to say I worked as

23  volunteer for three years in addition to four

24  clinical fellowships on uveitis and 20

25  publications compared to a candidate who just

1              THADDEUS  WANDEL

2    practiced in USA for only one year of surgery

3    at Sinai Hospital.  And had no public

4    location records.  Zero publication,

5    especially if we are both IMG.  And by IMG I

6    take that to mean International Medical

7    School Graduate?

8         A.   Yes.

9         Q.   Dr. Al Sawicki did he pass step 3

10   before entering the residency program?

11        A.   Yes.

12        Q.   Is it correct that Dr. Al Sawicki

13   had no publications?

14        A.   If he did it were minor.

15        Q.   Is it also true that he had no

16   grants?

17        A.   Yes.

18        Q.   In fact it would be impossible for

19   him as not being a faculty member to have a

20   grant?

21        A.   Correct.

22        Q.   And especially something like an

23   NIH grant?

24        A.   Yes.

25        Q.   And do you know how many



```
1                    THADDEUS WANDEL
2    fellowships did Al Sawicki have?
3         A.    None.
4         Q.    Is it fair to say, Dr. Wandel, that
5    Dr. Ali's credentials exceed Dr. Al Sawicki?
6         A.    No.
7         Q.    Why not?
8         A.    Dr. Al Sawicki did an internship at
9    a Johns Hopkins Hospital in Baltimore.  His
10   step 1 score was 145 or I think his step 2
11   score was similar.  So immediately presents
12   as a highly desirable resident candidate.
13        Q.    What Johns Hopkins Hospital?
14        A.    I would have to look at his c.v.
15        Q.    Are you sure it was Johns Hopkins
16   in Baltimore?
17        A.    It was affiliated, it's Hopkins
18   affiliated hospital.
19        Q.    Right.  It's not Johns Hopkins
20   Hospital, but a hospital affiliated with it?
21        A.    Yes.  And he had excellent
22   recommendation letters.  And, you know, he
23   was a good match for the other residents.
24   They wanted him.
25        Q.    How did the other residents meet
```



1                  THADDEUS WANDEL

2     him?

3          A.   I believe through the same system I

4     did, through skype.

5          Q.   Through a skype interview?

6          A.   A cellphone meeting or I'm not sure

7     exactly how.  I was isolated at that time and

8     asked only to participate in the phone call

9     interview.  Other interviews were being

10    arranged by our chairperson Dr. Hutchinson.

11         Q.   When you say you were isolated,

12    what does that mean?

13         A.   I didn't make the arrangements for

14    the interview.

15         Q.   So, how do you know who he was

16    interviewed by?

17         A.   I believe I was told who the list

18    was of the interviewers.  I can't remember at

19    the moment specifically who the other people

20    were.

21         Q.   Well, who gave you that list?

22         A.   Dr. Hutchinson.

23         Q.   Okay.

24         A.   He was the chairperson.

25         Q.   Dr. Al Sawicki had worked with Dr.



1              THADDEUS WANDEL

2    Hutchinson in Dolha Cutter, correct?

3        A.   Correct.

4        Q.   And Dr. Al Sawicki had gone to

5    medical school in Jordan, correct?

6        A.   Yes.

7        Q.   And except for the hospital somehow

8    affiliated with Johns Hopkins Dr. Al Sawicki

9    had done no other fellowships in the United

10   States?

11       A.   No, but they are not necessary for

12   being accepted as a resident.

13       Q.   Dr. Wandel, I'm showing you what is

14   marked Wandel Exhibit 12 and Hutchinson 1.

15            (Wandel 12, document, marked for

16       identification, as of this date.)

17       Q.   This is starts out in a chain, two

18   pages, they are Bates stamped NYMC WMC 183

19   and 184.  The first e-mail is from Dr. Ali to

20   Dr. Hutchinson, subject, my future plans.

21   Dr. Ali writes, I am sorry, but I have to add

22   that I had a meeting with Dr. Wandel two

23   weeks ago and he confirmed that I was not

24   treated fairly and he promised to help to

25   create a position for me after he heard in



1              THADDEUS WANDEL

2    details about the situation.  He mentioned

3    also that he was not aware about any openings

4    which has been filled.  He promised to talk

5    to you in this regard in helping out.  I sent

6    him recap e-mail after the meeting thanking

7    for his promise to help, second promise.  Dr.

8    Sharma aware of this conversation, as I

9    updated him after meeting and sent a memo as

10   well.  Do you recall the meeting with Dr. Ali

11   two weeks before July 12th?

12        A.   Can I see my response?

13        Q.   You response that same day to Mr.

14   Hutchinson says:  I cannot meet with Amro

15   without a witness and suggest that he hold,

16   this holds for anyone meeting with him.  I

17   suggest we need a letter signed by all of us

18   indicating that no promises of a residency

19   have been given him and suggest he look

20   elsewhere for employment.

21        A.   I remember the meeting.  I was

22   sitting in my office which has only one

23   entrance, which is in front of the office.

24   Dr. Amro came in the room unannounced and

25   immediately started to say something to the

```
 1                   THADDEUS WANDEL
 2    effect that he was going to give me one more
 3    chance before he sued us and that I should
 4    create a position for him for at least one
 5    year and that if he had one year with us he
 6    would not sue.  So that he was very angry I
 7    was getting a little nervous, I was thinking
 8    about the fact that he was in the door and my
 9    back was to the door without any exit.  He
10    left and my reaction to what he wrote was
11    that he still felt that he was guaranteed a
12    position and that he wasn't aware of
13    something that should have happened about
14    three years ago where he had volunteered to
15    work with Dr. Sharma without a guarantee for
16    a residency position and refused to accept
17    the fact that he might not be able to get a
18    residency position.  And he should have
19    looked for a job a year ago, two years ago
20    and left Dr. Sharma and gone on with his
21    life.
22         Q.   Had you ever known Dr. Ali to be
23    anything other than honest?
24         A.   Honesty in this perception.
25              MR. MILLUS:  I have to note my
```



1                    THADDEUS WANDEL

2          objection to form.  I had to get out of

3          mute.  You may answer Doctor, please

4          continue.

5          A.   Being honest and being aware of

6     your situation are two different things.  I

7     have a lot of friends who don't understand

8     where they are and are still very honest.  I

9     was in no position when he came in.

10         Q.   Excuse me, Doctor, there's no

11    question pending.

12              I put on the screen Bierman 3.  The

13    title is Meeting Minutes, date July 20, 2018,

14    time 12:00 noon, attendees Amro Ali, M.D.,

15    Frederick Bierman, Kelly Hutchinson, Thaddeus

16    Wandel and Michelle Hodge, note taker.  Do

17    you recall this meeting, Mr. Wandel?

18         A.   Yes, I didn't see the meeting

19    minutes, however.  So this is new for me.

20         Q.   Okay, fair enough.

21         A.   Can you make it a little larger.

22         Q.   Yes.  And then we will scroll

23    through it so you have a chance to look at

24    it.  How is that?

25         A.   Much better.



1                  THADDEUS WANDEL

2        Q.   So, I will scroll through it.  Let

3   me know when you are finished.  All right.

4   That second paragraph is his understanding of

5   how he was there.  Some of it was her notes

6   that said he would be rewarded, that's his

7   language?

8        A.   Yes.  The requirement for step 3

9   which he states was an absolute had to do

10  more with Dr. Bierman's thought process of

11  maintaining a high level of patient care and

12  safety within the greater hospital

13  environment.  And I think we had discussed

14  earlier in this meeting why Dr. Bierman felt

15  that the step 3 exam would be important for

16  Dr. Ali or Dr. Amro to take.

17       Q.   We can certainly go back through

18  the entire document and, here, this is the

19  last page, if you want to review it.  And I

20  will ask you please show me where in the

21  document Dr. Bierman says anything about

22  patient safety?

23       A.   He doesn't.  In this letter it's

24  not discussed.  It's Dr. Amro, Dr. Michelle

25  Hodge was taking notes, so these were words



1                   THADDEUS WANDEL
2      that or contacts that Dr. Amro used in
3      describing where he was and why he was where
4      he was at that meeting.
5          Q.   Let's focus on --
6          A.   Dr. Bierman actually, you know,
7      discussed this in his own words rather than
8      my actually implying his words.
9          Q.   Well, those words about patient
10     safety do not exist in this document, but
11     there is this.
12         A.   That is Dr. Amro's statement.
13         Q.   No, I beg to differ, Doctor.
14         A.   Wait a minute.  Dr. Bierman was at
15     the meeting, I'm sorry.
16         Q.   Yes, these are meeting minutes and
17     Michelle Hodge took down the statement Dr.
18     Bierman countered that this is a requirement
19     for IMG, International Medical Graduates.  Do
20     you doubt that Michelle Hodges was
21     incorrectly putting this down in her meeting
22     minutes?
23         A.   Okay.  If this is in meetings I
24     can't, you know, I can't say anything against
25     the meeting minutes.



1            THADDEUS WANDEL

2       Q.   Okay.  Great.  At the end of the

3   July 20th meeting what was the order of the

4   individuals leaving the room?

5       A.   I can't remember specifically.  I

6   think Dr. Amro left at first with Dr.

7   Bierman.  I'm not sure though.

8       Q.   If I told you Dr. Bierman left

9   first and then called for you and Dr.

10  Hutchinson to leave would that refresh your

11  recollection?

12      A.   All right.  The order of leaving

13  the meeting I have no specific recollection

14  if that's what happened, I have no objection.

15      Q.   Do you recall Michelle Hodges

16  shaking Dr. Ali's hand at the end of the

17  meeting?

18      A.   No.  Imagine, hand shaking would be

19  appropriate.

20      Q.   No one escorted Dr. Ali out of the

21  meeting, correct?

22      A.   Not to my recollection.

23      Q.   Do you know or recall anyone saying

24  that the requirement that international

25  medical graduates pass step 3 before



1                    THADDEUS  WANDEL

2     beginning their residency as, quote,

3     Bierman's law, closed quote?

4          A.   No, not offhand.

5          Q.   Do you have a recollection of Dr.

6     Bierman saying to you that your

7     recommendation letter for Dr. Ali will put

8     you in trouble?

9          A.   No.

10          Q.   Did Dr. Bierman tell you that your

11     recommendation letter will put us in trouble?

12          A.   No.  I don't remember that

13     language.

14          Q.   In the June 22nd meeting did you

15     hear Dr. Sharma suggest to Dr. Hutchinson

16     that Dr. Ali be given a trial period to test

17     his clinical skills?

18          A.   Not specifically.  I wouldn't be

19     surprised if he did, but that doesn't work.

20          Q.   Why not?

21          A.   It's not an -- it's not part of a

22     standard process.

23          Q.   The position given to Al Sawicki

24     was that position advertised?

25          A.   No, I don't think so.



1              THADDEUS WANDEL

2              MR. SADOWSKI:  Let's take ten

3        minutes and then I will probably be very

4        close to wrapping up.

5              (Whereupon, a short recess was

6        taken.)

7        Q.   Dr. Wandel, when is the last time

8   you spoke to Dr. Sharma?

9        A.   Actually been a while, a couple of

10   months.

11        Q.   Two months?

12        A.   At least, yes.

13        Q.   Prior to todays deposition, other

14   than your counsel did you speak with anyone

15   about the deposition you would give today?

16        A.   No.

17        Q.   When is the last time you spoke to

18   Dr. Bierman?

19        A.   Since I retired that would be

20   months ago too.  Probably June or something.

21        Q.   And when is the last time you spoke

22   to Dr. Hutchinson?

23        A.   I see her almost on a daily basis

24   on other resident issues administered and

25   administrative issues.



1              THADDEUS  WANDEL

2       Q.    Did you have an opportunity to

3   discuss today's deposition with her?

4       A.    No.

5       Q.    Did she tell you that she had been

6   deposed?

7       A.    No.  I still don't know if she was.

8       Q.    Do you know if other individuals in

9   this case have been deposed?

10      A.    I believe my attorney told me

11  that --

12      Q.    No, no, no.  Don't tell me anything

13  about your conversations with your attorney.

14  Okay?

15      A.    No.

16      Q.    I think you said on July 2nd Dr.

17  Ali appeared in your office?

18      A.    When?

19      Q.    Sometime in July Dr. Ali appeared

20  in your office?

21      A.    In the context of that e-mail that

22  I had.  The don't have -- we need a witness

23  for conversations?

24      Q.    Yes.

25      A.    Okay.



```
 1              THADDEUS WANDEL
 2       Q.   And that meeting you said Dr. Ali
 3   came in unannounced?
 4       A.   Yes.
 5            MR. SADOWSKI:  Okay.  Thank you.  I
 6       have no further questions.
 7            MR. MILLUS:  I have one question.
 8   EXAMINATION BY
 9   MR. MILLUS:
10       Q.   Doctor, do you recall counsel was
11   asking you questions regarding Dr. Ali coming
12   into your office?  Do you recall that?
13       A.   Vaguely.
14       Q.   Specifically insofar as you wrote
15   an e-mail that he showed you that said no,
16   someone should be with him alone?
17       A.   Yes, correct.
18       Q.   Do you recall?
19       A.   That we are talking about that
20   meeting.
21       Q.   What you started to say I was in no
22   position when he came in and then counsel
23   interrupted you absolutely appropriately
24   saying there was no question before you; do
25   you recall that?
```



1          THADDEUS WANDEL

2     A.   I can't hear you very well.

3     Q.   You said I was in no position when

4  he came in, that's what you were starting to

5  say and counsel appropriately interrupted you

6  saying there was no question before you; do

7  you recall that?

8     A.   Okay, I believe you.

9     Q.   I would like you to finish the

10 thought you were saying, I was in no position

11 when he, meaning Dr. Ali, came in and then

12 you stopped.  I would like you to finish your

13 thought on that, if you can.

14    A.   All right.  I was -- during all of

15 this time I have no position to guarantee or

16 to place Ali by myself in any resident

17 position and for him to suggest that I could

18 arrange for him a one-year position to get

19 him started training is irrational.

20    Q.   Let me ask you this:  You were

21 program director at the time?

22    A.   Yes.

23    Q.   Did you have the power to overrule

24 Kelly Hutchinson on a decision she made in

25 regard to residency status of someone?



THADDEUS WANDEL                                September 30, 2020
Amro Ali vs Westchester Medical Center                        69

```
 1                  THADDEUS WANDEL
 2         A.   No, she's my boss.  I serve at her
 3    discretion.  I have no contract.
 4         Q.   Who was your employer at the time
 5    in 2018, 2017, 2016, who was your employer?
 6         A.   I think at that time WM, the
 7    Westchester Medical Center was actually my
 8    employer.  And then actually ran, sponsored
 9    the resident, the program, ophthalmology
10    program.  After 2016 New York Medical College
11    took over the program.
12         Q.   So, 2016, after 2016, 2017, 2018
13    your employer was whom?
14         A.   I believe the Westchester Medical
15    Center.
16         Q.   You said a moment ago after '16
17    NYMC took it over?
18         A.   Took over the sponsorship.
19         Q.   Who remained your employer in 2017,
20    2018?
21         A.   New York Medical College.
22         Q.   Okay.  Now, did Dr. Sharma have the
23    power to authorize or give someone a
24    residency if he wanted to?
25         A.   No way.
```



1               THADDEUS WANDEL

2       Q.   Why is it no way?  You said that

3   very emphatically, why do you say no way?

4       A.   His position in the program was not

5   a clinical one.

6       Q.   What does that mean?

7       A.   He is a Ph.D. full professor of

8   ophthalmology and cell biology, but he has no

9   authorization to do anything more than write

10  a good letter of recommendation.

11      Q.   Let me ask you:  Who was Dr.

12  Sharma, if you know, in 2017 and 2018?

13      A.   Who employed him?

14      Q.   Who was his employer, yes?

15      A.   New York Medical College.

16      Q.   How about Dr. Bierman, who was his

17  employer, if you know, in 2017 and '18?

18      A.   I believe the Westchester Medical

19  Center.

20           MR. MILLUS:  I have no further

21      questions.  Thank you.

22           MR. SADOWSKI:  I have a couple of

23      follow-up.

24  EXAMINATION BY

25  MR. SADOWSKI:



```
 1              THADDEUS WANDEL
 2        Q.    Why did New York Medical College
 3   take over the sponsorship of the
 4   ophthalmology residency program in 2016?
 5        A.    I am not sure of the environment
 6   which that happened, but New York Medical
 7   College took over OB-GYN and ophthalmology of
 8   Westchester Medical Center continued
 9   sponsorship of all other resident training
10   programs.
11        Q.    How did New York Medical College
12   taking over the sponsorship of the
13   ophthalmology program change Dr. Bierman's
14   role over the residency program?
15              MR. MILLUS:   Objection to form.
16        You may answer.
17        A.    Technically I believe Dr. Richard
18   McCarrick who is the CIO for all medical
19   hospital college affiliations would have
20   taken Dr. Bierman's position.   But Dr.
21   Bierman has worked with me and with the
22   program or provides internship for me that we
23   work primarily with Dr. Bierman.
24        Q.    Who is, again, the director who
25   took over the ophthalmology residency for?
```



1                 THADDEUS WANDEL

2         A.    McCarrick is the designated

3    institutional official or DIO.  And he's in

4    charge of all training at all hospitals in

5    the New York Medical College system.

6         Q.    Was Dr. McCarrick ever apprised of

7    Dr. Ali's situation?

8         A.    I work primarily with Dr. Bierman

9    since at the time he was my supervisor and

10   mentor.  I don't recall where Dr. McCarrick

11   might have become aware of Dr. Amro's

12   lawsuit.

13        Q.    Well, even prior to the lawsuit if

14   Dr. McCarrick was in charge of the

15   ophthalmology residency program shouldn't he

16   have been made aware of Dr. Ali's situation?

17        A.    I -- yes, I will think so.  I'm not

18   sure of what route.

19        Q.    But you didn't apprise him of Dr.

20   Ali's situation?

21        A.    I may have and I'm not -- I don't

22   remember though.

23        Q.    Did you ever tell Dr. Ali orally or

24   in writing that you had no authority to

25   reward his work with a residency position in



```
 1                THADDEUS WANDEL
 2    the ophthalmology program?
 3         A.   That would be fair to say.  I use
 4    words as I can help, I can promote, I can
 5    provide as much access to getting interviews
 6    and providing, say, the letter of
 7    recommendation that I did.  But as an
 8    individual I cannot have one person come in
 9    under my job designation.
10         Q.   Right, so I'm asking.
11         A.   What it's -- what is called a
12    progress.
13         Q.   My question is:  Did you explicitly
14    tell Dr. Ali you had no power to reward him
15    with a residency position?
16         A.   Yes.  And in different words.
17         Q.   In what words?
18         A.   That I could not guarantee him a
19    position.
20         Q.   You used those words?
21         A.   Yes.
22         Q.   And when did you do that?
23         A.   Probably when it came up for him
24    asking if, you know, his work would result in
25    a quid pro quo for residency position.
```



1              THADDEUS WANDEL

2        Q.   So that could have happened very

3   early on in his tenure when he was hired as a

4   faculty member?

5        A.   That's right.  Way back many years

6   ago.

7        Q.   Do you know if that was ever put in

8   writing?

9        A.   No.

10       Q.   Why not?

11       A.   I don't know.  It never came up

12   that it would become an issue.

13       Q.   As Dr. Ali reiterated the promise

14   that he believed you had made to him in

15   exchange for his research work wouldn't it

16   have been fair to him to put in writing that

17   you had no authority to reward him with any

18   residency position?

19       A.   That came up in the e-mail that you

20   recently showed of my asking for a witness

21   for discussions with him and whether we

22   should write that we can't guarantee a

23   residency position signed by everybody who is

24   the leadership of the department.

25       Q.   And no one ever did that?



1                  THADDEUS WANDEL

2          A.   No, because it never came to our

3     attention that it might be an issue.

4          Q.   Even after you received that or

5     issued that e-mail did you write to Dr. Ali

6     that you had no authority to reward him with

7     a position after three years of his work in

8     research that bore your name and benefited

9     from New York Medical College?

10         A.   I never got feedback from the

11    people I e-mailed that that would be

12    appropriate.

13         Q.   And no time on your own when Dr.

14    Ali raised the issue of his acquiring a

15    residency position did you write to him I

16    have no authority to reward you thusly?

17         A.   By my actions and how I was working

18    with him I thought he would understand that.

19         Q.   And when you came to believe that

20    he did not have the same understanding you

21    did you did not put anything in writing to

22    him to dispel his belief, correct?

23         A.   Yes, which is the topic of that

24    e-mail that dates maybe a couple of years

25    ago.



1          THADDEUS WANDEL

2          Q.   Putting all other things aside, do

3    you think Dr. Ali was treated fairly by

4    working for New York Medical College

5    improving it's academic research, writing

6    multiple articles some bearing your name,

7    many bearing Dr. Sharma's name, doing IRB's,

8    doing lectures, promoting the creation of a

9    united clinic and then sort of saying to him

10   oh sorry, we didn't promise you a residency

11   program after three years of this hard work.

12   Do you think that was fair?

13         A.   That came up in the angry meeting

14   that Dr. Amro had that prompted me to ask if

15   we should be writing a letter.  And I would

16   never do what he did in his position.  I

17   would have left long ago.

18         Q.   Understood.  What you would do.

19   But I'm asking if you view the totality of

20   Dr. Amro, Dr. Ali's situation having labeled

21   for three years with no pay, created research

22   manuscripts, publications, even bearing your

23   name and the institutions name, do you think

24   Dr. Ali was treated fairly?  It's a simple

25   question.



1                 THADDEUS WANDEL

2        A.   Again, everybody behaves in a

3   different fashion compared to others.

4        Q.   I'm not asking about behavior.  I'm

5   asking in your mind do you think Dr. Ali was

6   treated fairly under those circumstances?

7                 MR. MILLUS:  Objection to form.

8        You may answer.

9        A.   That's a difficult question.

10  Everybody has their own way of needing in

11  life.  If he wanted to do what he did I would

12  never make a judgment call whether something

13  is fair or not fair.  That's the way he chose

14  to do it.

15       Q.   I'm asking in your mind, I know you

16  wouldn't do it.  I understand that.

17       A.   You probably wouldn't either.

18       Q.   I have done some things I regret

19  but for the betterment of man kind and a lot

20  of good deeds are if you know punished, but

21  I'm asking in fairness in your mind would you

22  expect it to be fair for Dr. Ali to work for

23  three years and walk away empty handed?

24       A.   He's had an interesting experience.

25  He's had a good learning experience.  He



THADDEUS WANDEL                                  September 30, 2020
Amro Ali vs Westchester Medical Center                          78

```
 1               THADDEUS WANDEL
 2   chose to do what he chose.  I'm lost to put
 3   words like good, fair, better for all.  I
 4   know what he did was actually going to work
 5   out over time to be in his best interest
 6   without having this happen he would not have
 7   some other opportunity that would come to him
 8   because of this experience.  So, in five, ten
 9   years from now he may look back on that and
10   sort of say Well, you know, that was a
11   learning experience now, I'm doing great.
12        Q.   Just to be clear, you would not
13   have done what he did?
14        A.   No.
15             MR. SADOWSKI:  Thank you.  No
16        further questions.
17             MR. MILLUS:  Thank you.
18             (Time noted:  2:05 p.m.)
19
20             _____
21                  THADDEUS WANDEL
22   Subscribed and sworn to before me
23   this ___ day of _____, 2020.
24
25   _____
```



1                    THADDEUS WANDEL

2                 C E R T I F I C A T E

3    STATE OF NEW YORK     )

4                              : ss.

5    COUNTY OF KINGS       )

6

7         I, DIANE BUCHANAN, a Notary Public

8         within and for the State of New York, do

9         hereby certify:

10             That THADDEUS WANDEL, the witness

11        whose deposition is hereinbefore set

12        forth, was duly sworn by me and that

13        such deposition is a true record of the

14        testimony given by the witness.

15             I further certify that I am not

16        related to any of the parties to this

17        action by blood or marriage, and that I

18        am in no way interested in the outcome

19        of this matter.

20             IN WITNESS WHEREOF, I have hereunto

21        set my hand this 11th day of October,

22        2020.

23        _____

24                  DIANE BUCHANAN

25



```
 1              THADDEUS WANDEL

 2    -------------- I N D E X -------------------

 3    WITNESS               EXAMINATION BY          PAGE

 4    THADDEUS WANDEL   MR. SADOWSKI          5, 71

 5                      MR. MILLUS            67

 6

 7    --------- INFORMATION REQUESTS --------------

 8    DIRECTIONS:  23

 9    RULINGS:  None

10    TO BE FURNISHED:  None

11    REQUESTS:  None

12    MOTIONS:  None

13

14    -------------- EXHIBITS -------------------

15    WANDEL                      FOR ID.

16    1         Letter            10

17    3         Document          36

18    4         E-mail            43

19    7         Letter            37

20    12        Document          57

21

22

23

24

25
```



```
 1              DEPOSITION ERRATA SHEET

 2

 3    Our Assignment No.:  J6046652

 4    Case Caption:  Amro Ali, M.D., vs.

 5    Westchester Medical Center

 6

 7       DECLARATION UNDER PENALTY OF PERJURY

 8

 9            I declare under penalty of perjury

10    that I have read the entire transcript of my

11    Deposition taken in the captioned matter or

12    the same has been read to me, and the same is

13    true and accurate, save and except for

14    changes and/or corrections, if any, as

15    indicated by me on the DEPOSITION ERRATA

16    SHEET hereof, with the understanding that I

17    offer these changes as if still under oath.

18                        _____

19                           Thaddeus Wandel

20    Subscribed and sworn to on the _____ day of

21    _____, 20 _____ before me.

22    _____

23    Notary Public,

24    in and for the State of

25    _____.
```



```
 1          DEPOSITION ERRATA SHEET

 2    Page No._____Line No._____Change to:_____

 3    _____

 4    Reason for change:_____

 5    Page No._____Line No._____Change to:_____

 6    _____

 7    Reason for change:_____

 8    Page No._____Line No._____Change to:_____

 9    _____

10    Reason for change:_____

11    Page No._____Line No._____Change to:_____

12    _____

13    Reason for change:_____

14    Page No._____Line No._____Change to:_____

15    _____

16    Reason for change:_____

17    Page No._____Line No._____Change to:_____

18    _____

19    Reason for change:_____

20    Page No._____Line No._____Change to:_____

21    _____

22    Reason for change:_____

23

24    SIGNATURE:_____DATE:_____

25              Thaddeus Wandel
```



```
 1              DEPOSITION ERRATA SHEET

 2    Page No._____Line No._____Change to:_____

 3    _____

 4    Reason for change:_____

 5    Page No._____Line No._____Change to:_____

 6    _____

 7    Reason for change:_____

 8    Page No._____Line No._____Change to:_____

 9    _____

10    Reason for change:_____

11    Page No._____Line No._____Change to:_____

12    _____

13    Reason for change:_____

14    Page No._____Line No._____Change to:_____

15    _____

16    Reason for change:_____

17    Page No._____Line No._____Change to:_____

18    _____

19    Reason for change:_____

20    Page No._____Line No._____Change to:_____

21    _____

22    Reason for change:_____

23

24    SIGNATURE:_____DATE:_____

25                  Thaddeus Wandel
```

