Robert W. Sadowski
Robert W. Sadowski PLLC
800 3rd Avenue, 28th Floor
New York, New York 10022
Tel. No.: (646) 503-5341
rsadowski@robertwsadowski.com

*Attorneys for Plaintiff Amro Ali, M.D.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AMRO ALI, M.D.,

                Plaintiff,

- against -

                        No. 19-cv-08324 (DLC)(DCF)

WESTCHESTER MEDICAL CENTER and
NEW YORK MEDICAL COLLEGE,

                Defendants.

**PLAINTIFF'S COUNTER STATEMENT TO DEFENDANT'S LOCAL RULE 56.1
STATEMENT**

**A.**    **The Parties**

        1.        Westchester Medical Center is owned and operated by the Westchester

County Health Care Corporation, a public benefit corporation of the State of New York. (N.Y.

Public Authorities Law § 3300 *et seq.*).

        **Response:** Admit.

        2.        New York Medical College ("NYMC") is a not-for-profit American

medical school located on a 565-acre suburban campus shared with WMC in Westchester

County, New York.

        **Response:** Admit.

3.      Plaintiff Amro Ali, M.D. ("Plaintiff"), who was born in 1971, is Egyptian by nationality. (Millus Decl. Ex. C pp. 8-9; Millus Decl. Ex. I.)[1]

**Response:** Admit.

[1] The term "Millus Decl." refers to the "Declaration of Paul F. Millus in Support of Defendants' Motion for Summary Judgment," dated October 30, 2020.

4.      Plaintiff is a graduate of Alexandria University in Alexandria, Egypt, where he received his medical degree in 1995. Thereafter, he continued his studies at Alexandria University, receiving a Master's degree in 2001 and performing an Ophthalmology residency at the Alexandria Eye Center between 2000 and 2002. (Millus Decl. Ex. C.)

**Response:** Admit.

5.      The United States Medical Licensing Examination ("USMLE"), which is taken in three "Steps," must be successfully completed by any candidate seeking to practice medicine in the United States. (Millus Decl. Ex. H pp. 13, 34.) In 1998, while still in Egypt, Plaintiff passed Steps 1 and 2 with scores below 80. A passing score at the time he took the exams was 75. Plaintiff did not take *and* pass Step 3 until April 2018. Plaintiff had previously sat for Step 3 of the USMLE and failed in April 2017. (Millus Decl. Ex. D pp. 45-46, 117-18, 173.)

**Response:** Admit the first sentence of paragraph 5.  Plaintiff states that the second and third sentences are immaterial to this case.  Under NYMC GME policy relating to the USMLE Step 3, "[a]ll residents and fellows in NYMC sponsored GME programs must pass Step 3 of the USMLE by the completion of the second year of their NYMC program (Program level 2 or PL-2) in which they are enrolled.  Sadowski Dec. dated October 26, 2020, Ex. 10.  In addition, Westchester Medical Center Resident/Fellow Agreement, Terms of Appointment, Policies and Procedures 2016-2017 provide that "[i]t is the policy of the Westchester Medical Center (WMC) that every WMC-based categorical residency training

program at WMC require trainees to pass Step 3 of the USMLE or COMLEX examination

sequence prior to the end of their second year of training.  Every WMC residency program

must have a policy that stipulates a deadline by which its residents must take and/or pass the

USMLE or COMLEX step 3 examination and that policy must be consistent with WMC and

New York Medical College (NYMC) policy.  WMC Residency Training Programs to which

this policy applies include Ophthalmology.  Sadowski Dec. Ex. 11.  Moreover, the

Accreditation Council for Graduate Medical Education ("ACGME") "the ACGME has no

requirements regarding the timing of the step 3 exam.  If a program is treating [International

Medical Graduates] IMGs and [American Medical Graduates] AMGs differently, that *may*

fall under the requirement regarding policies to prevent harassment." (emphasis in original).

Sadowski Dec. Ex. 12.  Accordingly, when Dr. Ali completed his step 3 exam is immaterial

because he was not allowed to enter the residency program, so there was no limit for his

passing the step 3 exam.  Dr. Ali's scores for step 1 and 2, which he took and passed in the

1990's has little bearing on his qualification as he has repeatedly proven himself clinically

and academically in the numerous fellowships, where he produced peer reviewed research

articles and performed clinical work all with outstanding praise from his supervisors.  *See*

Sadowski Dec. Exs. 14.  Indeed, Dr. Wandel, the NYMC Dr. Thaddeus Wandel, Resident

Program Director said, [Dr. Ali] sets himself apart from other candidates for a Residency

position by his dedication and willingness to help in all aspects of teaching, his development

of research projects that involve residents, and his desire to learn.  When you review his CV,

his Fellowships in Uveitis, Retina, and Neuro-Ophthalmology place him on a level where he

can lecture on these subspecialties.  Indeed, he volunteered and has started a series of lectures

that will review the Basic Science Volume 9, "Ocular Inflammation," in our Basic Science

Course.  He has 10 peer-reviewed publications and a similar number of posters and presentations." Sadowski Dec. Exs. 15 & 16.  The New York State Boards for Medicine does not require passing USMLE 3 before beginning a residency.  Sadowski Dec. Ex. 13.  Finally, NYMC knew Dr. Ali's scores for step 1 and 2 and that did not stop or even hesitate to appoint him to a faculty position where he would be doing research and teaching **residents.** Sadowski Dec. Ex. 17.

### B. The Complaint

6.   Plaintiff's Complaint contains three causes of action: (1) "Injunctive Relief," which is actually just a remedy; (2) age and national origin discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and, presumably, the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.*; and (3) age and national origin discrimination under N.Y. Executive Law § 296. None of the paragraphs alleging these violations mention the basis for the claims, and only in his Preliminary Statement in paragraph 1 does he mention age and "national origin," which he does without ever specifying what nationality he identifies with as the foundation of his national origin discrimination claim. (Millus Decl. Ex. A.).

**Response:**  Admit that the Complaint allegations speak for themselves.  Allegations, however, whether artful or inartful are not facts, let alone material facts, and allegations certainly are not admissible **evidence** on which a motion for summary judgment may be decided.

### C. Plaintiff's Professional Career From 2002-2015

7.   From 2002 through 2015, Plaintiff participated in various fellowships in the field of Ophthalmology in New York, Detroit, and Portland, including an internship in general surgery at North Shore University Hospital from 2002 to 2003, and he served as an Associate

Research Scientist from June 2011 to December 2015, when he joined NYMC as a Clinical Instructor. (Millus Decl. Ex. C.).

**Response:** Admit. Plaintiff contends however that these facts are immaterial to Plaintiff's discrimination causes of action or Defendants' defenses.

8.     After arriving in the United States, Plaintiff started as a general surgery intern in 2002 as a bridge to pursue his interest in Ophthalmology. He then pursued a series of fellowships in the field of Ophthalmology, where he hoped to improve his skills and his chances of obtaining a residency in Ophthalmology. (Millus Decl. Ex. D pp. 16-17.)

**Response:** Admit. Plaintiff contends however that these facts are immaterial to Plaintiff's discrimination causes of action or Defendants' defenses.

9.     While performing his Neuro-Ophthalmology fellowship at Henry Ford Healthcare between 2003 and 2004, Plaintiff applied for a residency position and did not receive it, conceding that Ophthalmology is "very competitive" and requires a "strong CV." (Millus Decl. Ex. D pp. 17-19, 22.).

**Response:** Admit. Plaintiff contends however that these facts are immaterial to Plaintiff's discrimination causes of action or Defendants' defenses.

10.     Plaintiff  was of the belief that improving his CV with fellowships in the field of Ophthalmology was his best route to obtaining an Ophthalmology residency, conceding that, even if performing fellowships is not required for obtaining a residency in Ophthalmology, it was the better "course of action" for him. (Millus Decl. Ex. D pp. 21-22.).

**Response:** Admit. Plaintiff contends however that these facts are immaterial to Plaintiff's discrimination causes of action or Defendants' defenses.

11.     In 2007, Plaintiff began another fellowship in Ophthalmology at the New York Eye and Ear Infirmary ("N.Y. Eye & Ear"). He again applied for a residency program and did not obtain one, stating "[t]his is a very high[ly] competitive program. They didn't even take people from the Ivy League." (Millus Decl. Ex. D pp. 23-25, 26.).

**Response:**   Admit.   Plaintiff contends however that these facts are immaterial to Plaintiff's discrimination causes of action or Defendants' defenses.

12.      After being unsuccessful in obtaining a residency position while at N.Y. Eye & Ear, Plaintiff was asked to stay one more year, and that the following year he "should be [sic] have a better chance at a match." Plaintiff declined the invitation and moved on to the Casey Eye Institute in Oregon. (Millus Decl. Ex. D pp. 28-29.)

**Response:**   Admit.   Plaintiff contends however that these facts are immaterial to Plaintiff's discrimination causes of action or Defendants' defenses.

13.     Plaintiff did not believe he was the victim of discrimination on the basis of either his national origin or age when he failed to obtain a residency while at N.Y. Eye & Ear, claiming "[b]ecause at that time I didn't work for free for three years. I didn't get verbal or written promises." (Millus Decl. Ex. D pp. 29-30.).

**Responses:**   Admit. Plaintiff contends however that these facts are immaterial to Plaintiff's discrimination causes of action or Defendants' defenses.

14.      While at the Casey Eye Institute, Plaintiff again applied for a residency position and was unsuccessful. When asked if he believed that anyone at the Casey Eye Institute had possibly discriminated against him on the basis of his age or national origin, Plaintiff testified "No, first of all, people in Oregon, they were very supportive, people very nice." (Millus Decl. Ex. D pp. 34-37.).

**Responses:** Admit.   Plaintiff contends however that these facts are immaterial to Plaintiff's discrimination causes of action or Defendants' defenses.

15.     At the same time that he worked at the Casey Eye Institute, Plaintiff also performed research as an Associate Research Scientist at New York University. That was until 2015, when he met Dr. Sansar Sharma, a Ph.D. in Physiology and professor of Ophthalmology, Cell Biology and Anatomy at NYMC. (Millus Decl. Ex. D pp. 38-40, 65; Millus Decl. Ex. E pp. 6-8.)

**Responses:** Admit.  Plaintiff contends however that these facts are immaterial to Plaintiff's discrimination causes of action or Defendants' defenses.

16.     Plaintiff joined NYMC's faculty in February 2016, after being approved for a position, but he began providing his volunteer services in or around December 2015. (Millus Decl. Ex. D pp. 65, 78.).

**Response:**  Admit.

17.     When Plaintiff and Dr. Sharma first met, Plaintiff explained his history, provided Dr. Sharma with his CV, and told Dr. Sharma his USMLE scores, which he was told were "low." (Millus Decl. Ex. D pp. 67-68.).

**Response:** Admit.   Plaintiff contends however that these facts are immaterial to Plaintiff's discrimination causes of action or Defendants' defenses.

18.     Plaintiff was well aware that the position being discussed with Dr. Sharma was unpaid.  (Millus Decl. Ex. D pp. 68-69, 73-74.).

**Response:**  Admit.

19.     There is nothing in writing before Plaintiff began his volunteer service for NYMC that stated that Dr. Sharma or Dr. Thaddeus Wandel, who was employed by NYMC as Resident

7

Training Program Director, ever promised Plaintiff that, if he performed well in the volunteer position, he would receive a residency position. (Millus Decl. Ex. D p. 72.).

**Response:**   Admit.   There are several writings providing circumstantial evidence that the parties understood that Dr. Ali would commence a residency at WMC outside of the San Francisco Match process.   In addition, Dr. Sharma admitted at his deposition in response to whether there was a promise to Dr. Ali that he was going to receive a residency position. "The issue here, **he was promised, that's correct.  Everybody knows that.  He knows it and we all know it.**" (Sadowski Dec. Ex. 6 (Sharma Dep. 89:3-10)).

20.      As for any promise that is alleged to have been made orally by Dr. Sharma to Plaintiff that he would obtain a residency position if he performed well as a volunteer, Plaintiff admitted that he had no idea whether Dr. Sharma even had the authority to make such a promise, stating "I don't know what he is power to do or not to do." (Millus Decl. Ex. D pp. 86-87.)

**Response:**  Dr. Ali did ask who has authority to grant him a residency and he was told Dr. Wandel, the Residency Program Director.  (Sadowski Dec. Ex. 3 (Ali Dep. 70:1-6; 79:3-8)). *See also* Ali Dec. Ex. D at 48.

### D.      <u>PlaintiffAttempts ToObtain a ResidencyPositionWhile At NYMC</u>

21.      Plaintiff applied for, but was not chosen for, a "non-match" residency position. (Millus Decl. Ex. C pp. 72-106, 118-19.)

**Response:**  Admit. Dr. Ali was denied a "non-match" position because he is a foreign medical school graduate, who denied the non-match position because he did not pass step 3 of the USMLE, which is a condition not imposed on American medical school graduates, by Dr. Bierman, who had no authority to even impose this discriminatory condition in the

ophthalmology residency program.  (Sadowski Dec. Exs. 9, 10, 11 at 40, 12, 13; Ali Dec. Ex. C).

22.     Non-match residency positions are filled by committee, and the decision makers receive input from many sources. (Millus Decl. Ex. H pp. 17-23, 27-28, 45-48, 54-57; Millus Decl. Ex. F pp. 14-16, 25-29, 33-35; Millus Decl. Ex. G p. 32.).

**Response:**  Program Directors have authority and accountability for the overall residency program.  Ali Dec. Ex. B. at 48.  Dr. Ali was asked who at WMC-NYMC could make the promise to him that he would receive the residency if he published research for NYMC:  The answer was the Program Director Dr. Wandel.  (Sadowski Dec. Ex. 3 (Ali Dep. 70:1-6; 79:3-8)).

23.     The individual who was chosen for the residency position, Dr. Sameer Al-Shweiki, is Jordanian and went to medical school in Jordan. (Millus Decl. Ex. D pp. 127-29, 136-37, 197.)

**Response:**  Admit.

24.     Dr. Al-Shweiki had excellent scores on Steps 1 and 2 of the USMLE and passed Step 3 of the USMLE as well. (Millus Decl. Ex. H pp. 19, 22, 54-56; Millus Decl. Ex. G p. 28.)

**Response:**  If Dr. Shweiki was accepted into the residency program only after passing step 3, it confirms WMC's discriminatory conditions imposed on foreign medical graduates.  It is also questioned whether he passed step 3 because public information shows that he does not have a New York State medical license.  Ali Dec. Ex. B.  In any event, Dr. Ali is far more qualified than Dr. Shweiki.

25.     Dr.  Al-Shweiki completed an internship at a hospital affiliated with Johns Hopkins in Baltimore. (Millus Decl. Ex. H p. 55.)

**Response:**  Dr. Shweiki completed an internship at Sinai Hospital in Baltimore, whose General Surgery Department has an affiliation with Johns Hopkins, which is also immaterial to Plaintiff's claim of discrimination.  (Sadowski Dec. Ex. 3 Ali Dep. 128:24-129:2) Ex. 4 (Wandel Dep. 55:8-20).

26.     Dr. Al-Shweiki had worked with, and was recruited by, Dr. Kelly Hutcheson, who, at the time, was the new Director of Ophthalmology at WMC and Chair of Ophthalmology at NYMC. (Millus Decl. Ex. D pp. 121, 197; Millus Decl. Ex. G pp. 26-29; Millus Decl. Ex. H pp. 28, 56-57; Millus Decl. Ex. E pp. 50-51.)

**Response:**  Admit, however, this is immaterial to Plaintiff's claim of discrimination.

27.     Plaintiff believes he is more qualified than Dr. Al-Shweiki because of Dr. Al-Shweiki's alleged lack of publications and grant procurement, but he concedes that Dr. Al-Shweiki had an advantage in that he "had the pleasure to work with the Chairman [Dr. Hutcheson]." (Millus Decl. Ex. D pp. 127-28.)

**Response:**  Admit, however, that Dr. Shweiki's having worked with Dr. Hutcheson is immaterial to Plaintiff's discrimination claim.

28.     When Plaintiff learned that Dr. Al-Shweiki would be receiving the residency position he met with Dr. Hutcheson. He never told her he felt he was the victim of discrimination. Instead, he claimed that he had allegedly been promised the position. (Millus Decl. Ex. D pp. 137-38.)

**Response:**  Deny.  Dr. Ali countered Dr. Bierman's requirement of passing step 3 that a different unwritten discriminatory requirement of passing step 3 was applied only to foreign international medical graduates, not American medical school graduates.  (Sadowski Dec. Ex. 9).  Moreover, in his appeal letter to Dr. Hutcheson, Dr. Ali states he was treated "unfairly" and

10

that he was "clear  about [his] age, [and] country of origin."  Dr. Ali in his appeal, he states, "[i]t

is very clear that step 3 is required by IMG and not AMG.  Treating AMB and IMG differently

falls under prevention of harassment policy according to ACGME."  (Sadowski Dec. Exs. 18 &

19).  Dr. Ali also stated that it is "unfair" to differentiate between . . . (American graduate vs

foreign graduate)." *Id.*

29.    Although Plaintiff believes he was wrongfully required to pass Step 3 of

the USMLE prior to beginning a residency because he went to a foreign medical school, Plaintiff

concedes that not all students at U.S. medical schools are necessarily American, and that not all

students at foreign medical schools are necessarily non-American (Millus Decl. Ex. D pp. 107-

09, 154-55), and Plaintiff has no proof that American graduates of foreign medical schools were,

or would be, treated differently than non-American graduates of foreign medical schools (Millus

Decl. Ex. D pp. 134, 154-57).

**Response:**  Plaintiff is not claiming that he is representative of a class; his claim is a

violation of his individual rights.  Therefore, this assertion is immaterial.

30.    According to Plaintiff, Dr. Wandel jokingly questioned Plaintiff's ability to wake

up in the middle of the night if he were a resident, which Plaintiff considered to be a reference to

his age, and which, according to Plaintiff, was repeated to Dr. Sharma. (Millus Decl. Ex.

D p.142-43.)

**Response:**  Admit.  Whether said jokingly or not is irrelevant.  The statement was said

by the Program Director repeatedly.

31.    According to Plaintiff, Dr. Wandel also said to Dr. Sharma that Plaintiff looks

older than he really is. (Millus Decl. Ex. D p. 142.)

**Response:**  Admit.

11

32.     This is in spite of the fact that Dr. Wandel was one of the individuals who was actively trying to help Plaintiff achieve his dream of an Ophthalmology residency. (Millus Decl. Ex. E pp. 24-25, 46-48; Millus Decl. Ex. H pp. 18-23, 32-34, 50-52; Millus Decl. Ex. G p. 26.)

**Response:**  The issue of Dr. Wandel's or Defendants' motives is a question for the jury in a discrimination case.

33.     Other than the alleged requirement that he pass Step 3 of the USMLE and Dr. Wandel's two purportedly discriminatory remarks, Plaintiff has no other proof that Defendants ever did or said anything to him suggesting he was the victim of discrimination based on his age or national origin, including, but not limited to, any sort of posting, cartoon, or email he thought was discriminatory towards him on the basis of his age or national origin. (Millus Decl. Ex. D pp. 149-151.)

**Response:** Deny.  *See* paragraphs 20 through 57 of Plaintiff's Counter Rule 56.1 Statement.

### PLAINTIFF'S COUNTER RULE 56.1 STATEMENT

1. Dr. Ali's national origin is Egypt.  He graduated from Alexandria University Medical School in Alexandria, Egypt, in 1995.  (Declaration of Robert W. Sadowski dated Nov. 28, 2020 ("Sadowski Dec.") Exs. 1 (Ali 26) & 2 (Def. Ex. A)).

2. After his internship, he practiced general ophthalmology in Egypt until 1999, when he was awarded a 6-month research fellowship at Harkness Eye Institute, Columbia Presbyterian Medical Center in New York.  (*Id.*).

3. From 2000 to 2002, Dr. Ali returned to Egypt to attend a residency program in ophthalmology at the Alexandria Eye Center health minister hospitals, Alexandria, Egypt.  (*Id.*).

4. In 2003, Dr. Ali moved to the United States to pursue his career in ophthalmology. Between 2003 and 2011, Dr. Ali attended four clinical fellowships:  Neuro-Ophthalmology at Henry Ford Health Care in Detroit, Michigan, from 2003 to 2004; Retinal Diseases at the same institution from 2004 to 2006; Uveitis at the New York Eye and Ear Infirmary in New York from 2007 to 2009; a second Uveitis fellowship at the Casey Eye Institute at the Oregon Health Science University in Portland, Oregon, from 2009 to 2011.  (*Id.*).

5. During all of Dr. Ali's clinical fellowships, he examined patients, prescribed medication, provided instruction and worked alongside ophthalmologists who graduated from U.S. medical schools and U.S. residency programs.  Dr. Ali is well known in the ophthalmic society by his contributions and he was awarded Active member of American Academy of Ophthalmology. (Sadowski Dec. Ex. 3 (Ali Dep. 17:1-19)).

6. Dr. Ali worked very hard for years at prestigious institutions to develop his clinical and academic skills.  In addition, Dr. Ali did not work for free at any of these institutions and he received no verbal or written promises from them.  Dr. Ali did not help these institutions in the same way he helped NYMC to establish research, to improve research, and to overcome the citation it had for its lack of active research and funding.  (*Id.* Ex. 3 (Ali Dep. 30:1-9)).

7. In 2011, Dr. Ali moved to New York and became an Associate Research Scientist at New York University School of Medicine, a paid position.  (*Id.* Ex. 3 (Ali Dep. 73:17-21).  In 2014, Dr. Ali was awarded a research grant from The Glaucoma Foundation—a prestigious accomplishment.  (Sadowski Dec. Ex. 1 at 2; Ex. 3 Ali Dep. 50:5-14).

**B. Dr. Ali's Appointment to a Faculty Position at New York Medical College.**

8. As a teaching hospital and medical school, Defendants WMC and NYMC receive federal and state funds from Medicare and Medicaid to support their Graduate Medical Education ("GME") program.  (*See* Sadowski Dec. Ex. 4 (Wandel Dep. 7:17-23)).

9. In 2012, the Accreditation Council for Graduate Medical Education ("ACGME") cited NYMC because it failed to demonstrate compliance with the requirement of "Scholarly Activities" (Common Program Requirement: II.B.5.b) (1) [that] [s]ome members of the faculty should also demonstrate scholarship through peer-reviewed funding.  (*Id.* Ex. 4 (Wandel Dep. 11:9-20); Ex. 5 at 1 (Wandel Ex. 1)).  For this failing, NYMC was placed on academic probation by ACGME.  (Sadowski Dec. Ex. 6 (Sharma Dep. 20:22-25; 59:22-60:5); Ex. 4 (Wandel Dep. 11:9-20)).

10. In response to this failing, in the fall of 2015, Dr. Raymond Wong Interim Chairman of the Department of Ophthalmology of NYMC recommended to Dean Miller of NYMC that Dr. Ali be brought on board in the Department of Ophthalmology as a full time instructor stating: "He [Dr. Ali] is an experienced researcher and will be submitting grant and International Review Board ("IRB") proposals.  This is in line with your recent initiatives to enhance research at the SOM [School of Medicine]."  (*Id.* Exs. 7 & 8 (Wandel 19 & Ali 7)).

11. In October 2015, Dr. Ali arranged with the Ophthalmology Program Director Dr. Wandel and Senior Researcher Dr. Samar Sharma that Dr. Ali would become a full-time faculty member and produce research and publish scholarly articles in exchange for a residency position in ophthalmology.  (*Id.* Ex. 6 (Sharma Dec. 37:23-25, 38:11-13)).  Dr. Sharma said, "I don't have money, but with your good research and good work, you will be having your residency."  (*Id.* Ex. 3 (Ali Dep. 69:2-7).

14

12. From day one, it was understood that Dr. Ali would assume the faculty position **without pay** to enhance NYMC's scholarly publications of research in exchange for a residency in ophthalmology.  (*Id.* Ex. 3 (Ali Dep. 69:2-7)).

13. Dr. Ali was asked who at WMC-NYMC could make the promise to him that he would receive the residency if he published research for NYMC:  The answer was the Program Director Dr. Wandel.  (*Id.* (Ali Dep. 70:1-6; 79:3-8)).  In addition to that, Dr. Ali read an e-mail on Dr. Sharma's computer screen that Dr. Wandel wrote to Dr. Sharma telling him: "Amro is doing a great job. We have to find him a position."  (*Id.* (Ali Dep. 74:4-18)).

14. Dr. Ali did not solicit the position at WMC-NYMC.  Dr. Ali was gainfully employed at NYU, a highly rated medical institution, compared to WMC-NYMC, which has a low rating among medical schools, and in fact was on academic accreditation probation with ACGME.  So, it made no sense for Dr. Ali to move from NYU to NYMC to work for free without receiving a coveted residency position.  (*Id.* (Ali Dep. 73:17-21)).

15. Dr. Sharma knew Dr. Ali well.  While at the New York Eye and Ear Infirmary during 2007 to 2009, Dr. Ali and Dr. Sharma had many interactions on research collaborations.  (*Id.* Ali Dep. 41:10-42:20)).  During Dr. Ali's time at NYU, he also established many research collaborations with different departments inside NYU and outside NYU, and one of the people Dr. Ali approached to work on a research project with him on stem cell transplants was Dr. Sharma.  (*Id.*).  While working together, Dr. Sharma and Dr. Ali discussed how NYMC had to improve its research, and how Dr. Ali could help fulfill that need, and how Dr. Ali's joining NYMC could be mutually beneficial.  (*Id.*).  Dr. Ali was very clear that he could stay at NYU, but he did not plan to spend his career in research; he wanted to do clinical patient care.  (*Id.*).  Dr. Ali expressed to Dr. Sharma his interest to enter a residency program.

15

16. When Dr. Ali agreed to join NYMC, it was clearly understood that his research work would garner him a residency position.  (*Id.* (Ali Dep. 74:11-19)).  At the time he became a faculty member at NYMC, the Ophthalmology department knew Dr. Ali's age, his United States Medical Licensing Examination scores for two of the three examinations required to practice, had all his records and recommendations, and certainly knew he was the graduate of a foreign international medical school.  (*Id.* Ex. 3 (Ali Dep. 43:2-15); Ex. 4 (Wandel Dep. 13:4-14:2)).

17. Dr. Wandel promised Dr. Ali that he would receive clinical privileges and sign his New York state medical license, but Dr. Wandel also failed to fulfill this commitment.  (*Id.* Ex. 4 (Wandel Dep. 33:8-18)).

18. While working with Dr. Sharma at NYMC, Dr. Ali published eight scholarly papers, published two chapters in textbooks, wrote two grant proposals, and lectured residents in ophthalmology.  (*Id.* Ex. 6 (Sharma Dep. 12:15-13:9)).  Drs. Sharma's and Wendel's names appeared on all of Dr. Ali's clinical publications, which were published under the auspices and in the name of NYMC.  (*Id.* Ex. 6 (Sharma Dep.14:17-15:22); Ex. 4 (Wandel Dep. 15:9-22).

19. As to Dr. Ali's character and work, Dr. Sharma testified that Dr. Ali was "one of the best."  (*Id.* Ex. 6 (Sharma Dep. 16:13-23)).  Dr. Ali "is extremely honest."  (*Id.* Ex. 6 (Sharma Dep. 16:24-17:4)).  Dr. Ali's interactions with residents in the department was "excellent."  (*Id.* Ex. 6 (Sharma Dep.17:5-8)).  Dr. Sharma testified that Dr. Ali "had the skills necessary to successfully complete a residency at WMC," and supported his application to the residency program.  (*Id.* Ex. 6 (Sharma Dep. 22:14-23:16).

**C. A Confluence of Irregularities, False Representations, and Facially Discriminatory Conditions Leads to only One Reasonable Conclusion: That Dr. Ali Was Subjected to Discriminatory Animus When Defendants Denied Him the Promised Ophthalmology Residency.**

**1.  The International Medical Graduate Discrimination.**

16

20. Defendants put discriminatory hurdles in place. The first hurdle was when Dr. Bierman explicitly stated and memorialized in meeting minutes that as an International Medical Graduate ("IMG"), Dr. Ali must pass USMLE step 3 before he could enter the residency program, a requirement not imposed on American Medical Graduates ("AMGs"). (Sadowski Dec. Ex. 9 at 2 (Bierman Ex. 3) (July 20, 2018 Meeting Minutes)).

21. Under NYMC GME policy relating to the USMLE Step 3, "[a]ll residents and fellows in NYMC sponsored GME programs must pass Step 3 of the USMLE by the completion of the **second year** of their NYMC program (Program level 2 or PL-2) in which they are enrolled." (Sadowski Dec. Ex. 10 (Ali Ex. 1 (New York Medical College GME Policy USNMLE 3)).

22. In addition, Westchester Medical Center Resident/Fellow Agreement, Terms of Appointment, Policies and Procedures 2016-2017 provides that "[i]t is the policy of the Westchester Medical Center (WMC) that every WMC-based categorical residency training program at WMC require trainees to pass Step 3 of the USMLE or COMLEX examination sequence **prior to the end of their second year of training**. Every WMC residency program must have a policy that stipulates a deadline by which its residents must take and/or pass the USMLE or COMLEX step 3 examination and that policy must be consistent with WMC and New York Medical College (NYMC) policy." (*Id.* Ex. 11 (Ali Ex. 23 at 40) (WMC Resident/Fellow Agreement, Terms of Appointment, Policies and Procedures 2016-2017)). WMC Residency Training Programs to which this policy applies include Ophthalmology. (*Id.*).

23. The "the ACGME has no requirements regarding the timing of the step 3 exam." (Sadowski Dec. Ex. 12 (Ali 19)).

24. The New York State Boards for Medicine does not require passing USMLE 3 before beginning a residency. (Sadowski Dec. Ex. 13 (Sharma Ex. 14)).

25. The ACGME regulations provide that if a program is treating [International Medical Graduates] IMGs and [American Medical Graduates] AMGs differently, that *may* fall under the requirements regarding policies to prevent harassment." (Sadowski Dec. Ex. 12 (Ali Ex. 19)) (emphasis in original).

26. Dr. Ali's scores for step 1 and 2, which he took and passed in the 1990's have little bearing on his qualifications because he has repeatedly proven himself clinically and academically in the numerous fellowships at prestigious institutions in the U.S., where he produced peer reviewed research articles and performed clinical work all with outstanding praise from his supervisors. *See* Sadowski Dec. Ex. 14 (Ali Exs. 2 & 3; (Def. Exs. H-L)). Indeed, Dr. Wandel, the NYMC Resident Program Director said, [Dr. Ali] sets himself apart from other candidates for a Residency position by his dedication and willingness to help in all aspects of teaching, his development of research projects that involve residents, and his desire to learn. When you review his CV, his Fellowships in Uveitis, Retina, and Neuro-Ophthalmology place him on a level where he can lecture on these subspecialties. Indeed, he volunteered and has started a series of lectures that will review the Basic Science Volume 9, "Ocular Inflammation," in our Basic Science Course. He has 20 peer-reviewed publications and a similar number of posters and presentations." (Sadowski Dec. Ex. 15   (Wandel Ex. 3) & Ex. 16 (Sharma Ex. 4)).

27. NYMC knew Dr. Ali's scores for step 1 and 2 before he was appointed a faculty member to **teach residents,** and that did not stop NYMC or even call into question his qualifications for his appointment to a faculty position to teach residents. (Sadowski Dec. Ex. 17 (Ali Ex. 5); Ex. 4 (Wandel Dep. 22:15-25)).

28. At the time Dr. Ali was appointed to the faculty, Dr. Wandel, the residency training Program Director and the only person with authority to recruit and select residents according to

18

the ACGME Program Director Guidebook rules, was well aware of Dr. Ali's qualifications and exam scores.  (*Id.* Ex. 4 (Wandel Dep. 12:1-13:25)).

## 2.  Dr. Ali Was Blocked at Both Avenues to a Residency at WMC for Discriminatory Reasons.

### a.  Denied Success Through the Match by Fabricated Reports.

29. There are two avenues to obtain a residency at WMC:  Either through the San Francisco Match ("the Match"), which is a formal process whereby applicants apply to the institutions of their choice for residency positions and institutions rank applicants for selection to their residency programs; or outside the Match.

30. At Dr. Wandel's suggestion, Dr. Ali applied through the Match in the fall of 2016. Dr. Ali ranked highly and was invited to interview with Defendants, was interviewed by faculty and residents, and believed he was supported by all the doctors, including residents who had interviewed him.  (Sadowski Dec. Ex. 9 (Bierman Ex. 3)).  After the interview process Dr. Wandel told Dr. Ali that resident Dr. Eric Rosenberg[1] gave a negative report as the representative of all of the residents who interviewed Dr. Ali, that Dr. Ali would not work "smoothly" with the group of residents.  (Sadowski Dec. Ex. 4 (Wandel. Dep. 21:13-22:14)).

31. Dr. Wandel testified that on the same day that Dr. Ali was interviewed on December 6, 2016, Dr. Wandel collected reports from interviewers including Dr. Rosenberg's negative report (*id.* (Wandel Dep. 38:8-23.)), and for that reason, Dr. Wandel said he could not rank Dr. Ali at a level to succeed in the Match.

---

[1] Dr. Rosenberg, like Dr. Ali, worked for Dr. Sharma performing research.  Dr. Rosenberg was not selected for his residency at WMC through the Match, he obtained a residency "Off Match" after working for Dr. Sharma.  (Sadowski Dec. Ex. 6 (Wandel Dep. 26:5-20)).

32. Dr. Sharma, for whom Dr. Rosenberg worked before obtaining his residency position, testified that Dr. Rosenberg was supportive of Dr. Ali's residency application "as many times as he can say.  Yes, yes."  (Sadowski Dec. Ex. 6 (Sharma Dep. 51:18-52:4)).

33. Dr. Ali spoke to Dr. Rosenberg over the telephone on July 10, 2018, and asked if and why he said that he did not have support from residents.  Dr. Rosenberg responded, that Wandel lies.  (*Id.* Ex. 3 (Ali Dep. 108:12-109:18)).

34. To deny Dr. Ali success in the Match, Dr. Wandel lied twice.  Dr. Rosenberg did not give a negative report on Dr. Ali, and second, Dr. Rosenberg was not even available on December 6 to interview Dr. Ali, or provide a negative report.  Dr. Rosenberg in a text communication to Dr. Ali states that "I didn't interview you. I was at Met[ropolitan Hospital] doing surgery."  (Declaration of Dr. Ali dated November 28, 2020 ("Ali Dec.") Ex. A).

35. Dr. Wandel created another pretextual theory that the San Francisco Match has records that will show a gap in training, and if there is a gap in training of more than two or three years there is a concern about clinical skills.  (Sadowski Dec. Ex. 4 (Wandel Dep. 46:21-47:25)).

36. Dr. Sharma proposed a remedy for any concern about Dr. Ali's clinical skills:  Give Dr. Ali a probationary time to test his skills.  Dr. Hutcheson, however declined to offer Dr. Ali a training period to test his clinical skills.  (*Id.* Ex. 6 (Sharma Dep. 88:15-25)).

37. In any event, Dr. Ali had more clinical experience than any other resident.  (*Id.* Exs. 14 & (Ali Ex. 1, 2 & 3; & Def. Exs. H-L)).  In any event, as Dr. Wong, prior acting chair testified, "we don't expect residents to be experienced."  (Sadowski Dec. 26 (Wong Dep. 21:15-18).

     **b.  Denial Outside the Match for Multiple Pretextual and Discriminatory Reasons.**

38. At his deposition, Dr. Sharma admitted with regard to the promise of a residency made to Dr. Ali, "The issue here, **he was promised, that's correct. Everybody knows that. He knows it and we all know it.**" (*Id.* (Sharma Dep. 89:3-10)). Dr. Sharma goes on to testify that the position for Dr. Ali "disappeared when he finish[ed] the Step 3. There was no position left." (*Id.*).

39. Dr. Sharma testified that if the "stipulation of Step 3 wasn't there," Dr. Ali would have had the residency position that opened when Dr. White left the program. (*Id.* (Sharma Dep. 111:20-112:10)). Dr. Sharma testified that **Dr. Ali "deserved" the residency position.** (*Id.* (Sharma Dep. 112:11-16)).

40. Dr. Ali wrote a written appeal letter to Dr. Hutcheson, which Dr. Sharma edited and testified that he would have corrected any factual inaccuracies in the letter. (*Id.* (Sharma Dep. 82:9-24); *see also* Sadowski Dec. Exs. 18 & 19- (Hutcheson 10 & Def. Ex. R (redline version of Dr. Sharma's edits)). Dr. Sharma approved the appeal letter, saying in his email to Dr. Ali that the "contents are fine." (Sadowski Dec. Ex. 20 ( Sharma Exs. 13 & 15)).

41. Defendants contend that Dr. Wandel had no authority to promise a residency to Dr. Ali. Dr. Wandel testified that he never stated in any writing that he was not in a position to offer a residency position to Dr. Ali in reward for his volunteer research work as a faculty member of NYMC. (*Id.* (Wandel Dep. 75:4-12)). Under ACGME rules and guidelines book, as Program Director, Dr. Wandel is the official in charge of the overall program. (Ali Dec. Ex. B at 48).

42. Dr. Wong wrote Dr. Ali's recruitment letter to NYMC School of Medicine Dean Miller, based on Drs. Sharma's and Wandel's request. (Sadowski Dec. Ex. 21 (Wong. Dep. 12: 2; 13:1-20; 20:15-22)).

43. Dr. Ali was recruited by Dr. Sharma "to help Dr. Sharma develop a research program." Dr. Sharma was having issues obtaining NIH grants to fund research in optic nerve regeneration, and sought out Dr. Ali as a new person to create new ideas for research in

ophthalmology.  In fact, Dr. Sharma had not acquired an NIH grant since 2004.  (*See* Ali Dec. Ex. B).

44. Dr. Ali joined the department to fulfill the need for more academic research at the institution based on the recommendations from Dr. Wandel and Dr. Sharma and in response to Dean Miller's desire to beef up the publication of scientific research in response to the citation from ACGME.  (Sadowski Dec. Ex. 21 (Wong. Dep.13:1-17)).

45. Based on Program Director Dr. Wandel's promise, Dr. Ali expected that he would commence a residency outside the Match on July 1, 2018—after almost three years of producing free research for Defendants.  (*See* Sadowski Dec. Ex. 22 (Wandel Ex. 6)).

46. When a residency vacancy arose, Dr. Wandel wrote to Dr. Ali "There is a high likelihood that you might start as soon as we learn that you passed Step 3-not 7/1/2018."  (*Id.*).

47. Passing step 3 is not a requirement for acceptance to the residency program at WMC.  (Sadowski Dec. Ex. 6 (Sharma Dep. 30:14-32:10).

48. Dr. Ali spoke to Dr. Sharma many times that he felt discriminated by the condition that as an IMG-foreigner, he had to pass step 3, when it was not necessary for AMGs to enter the residency program.  (*Id.* (Sharma Dep. 52:19-53:13)).

### c.  A Younger and Far Less Qualified Applicant Received the Vacated Residency Position Under Questionable Circumstances.

49. In preparation for entering the residency program, as expected, Dr. Ali was sent by Dr. Wandel to Metropolitan Hospital for orientation, to shadow senior residents, and learn the systems.  (Sadowski Dec. Ex. 6 (Sharma Dep. 52:5-18)).  The assignment to Metropolitan is done only for applicants who are accepted into the residency program.  (Sadowski Dec. Ex. 23 (Deposition of Randi Hartman 9:14-10:5)).  Dr. Ali's orientation and preparation at Metropolitan

Hospital was a step in the process of preparing Dr. Ali to start his residency.  (Sadowski Dec. Ex. 6 (Sharma Dep. 52:5-18)).

50. In April 2018, Dr. Ali passed Step 3.

### d.   Irregularities in Dr. Ali's Appeal of the Denial of a Residency Position

51. On July 1, 2018, three weeks before Dr. Bierman denied Dr. Ali's appeal and reaffirmed the condition on IMGs of passing step 3 before entering residency, Dr. Bierman no longer had responsibility for oversight and administration of WMC's ACGME-accredited specialty and subspecialty training program in the Ophthalmology residency.  (Ali Dec. Ex. E at 4).  Dr. Bierman no longer was the Designated Institutional Official with any oversight of the Ophthalmology residency program to maintain compliance with Institutional, Common and Program specific requirements and conformity of the clinical learning environment with standards of the ACGME.  Ali Dec. Ex. E at 4 (Westchester Medical Center Accredited as Sponsoring Institution by ACGME).

52. At the July 20, 2020 meeting, Dr. Hutcheson, Chief of Ophthalmology, and Dr. Wandel, Ophthalmology Program Director, remained silent and complicit as Dr. Bierman expounded on the Ophthalmology Residency Program and his unwritten rule applicable only to IMGs.  (Sadowski Dec. Ex. 9 (Bierman Ex. 3) (July 20, 2020 Meeting Minutes)).

53. In Defendant's *post hoc* rationale for Bierman's Rule, Dr. Wandel suggested that Bierman's requirement of passing step 3 was needed "to assess clinical competency" of Dr. Ali.  (Sadowski Dec. Ex. 4 (Wandel Dep. 40:6-18)).  Neither Bierman nor anyone else, ever in writing, said anything about step 3 being necessary to ensure patient safety or clinical competency.  The meeting minutes of July 20, 2018 also do not mention patient safety or the gap in Dr. Ali's residency.  (*Id.* Exs. 9 (Bierman Ex. 3) & 4 (Wandel Dep. 62:23-25)).  The patient

safety and the false assertion of a "gap" in training are pure *post hoc* pretext.  The only rationale Bierman ever gave for his decision is that Dr. Ali was an IMG, not an AMG.  (*Id.* Ex. 9 (Bierman Ex. 3).

       **e.  Age Discrimination.**

54. Dr. Wandel, in referring to the amount of work, questioned Dr. Ali capabilities to manage referring to his age and ethnicity and referring to Dr. Ali on different occasions about cultural barriers and if he can wake up early or respond to emergency phone call in the middle of the night.  (Sadowski Dec. Ex. 4 (Wandel Dep. 21:20-22:6)).

55. This a statement from Program Director Dr. Wandel, the only decision maker with authority under ACGME rules; it is a serious statement about Dr. Ali's capability due to his age. (Sadowski Dec. Ex. 3 (Ali Dep. 134:1-15)).

56. Dr. Sharma testified that Dr. Ali is older than all the residents, and that people in the department talk about it, they know the family issues, they talk about the age issue.  The question was posed to Dr. Sharma:  "How old is he? I said, this old." The reply was: "But he looks older." "I said, no, he is not that old." (Sadowski Dec. Ex. 6 (Sharma Dep. 97:14-25; 98:1-11)).

57. Dr. Wandel testified that a gap in training of more than a couple of years between the PGY1 year and the initiation of the PGY2 year raises concerns about the capability of the individual to be able to deal with complex medical issues that are part of management in the residency training program. (Sadowski Dec. Ex. 4 (Wandel Dep. 46:15-47:11)).

       For all the above reasons and those contained in prior submissions, Plaintiff respectfully requests that the Court denied Defendants' Joint Motion for Summary Judgment.

Dated: New York, New York
November 30, 2020

/s/Robert W. Sadowski
ROBERT W. SADOWSKI PLLC
800 3rd Avenue, 28th Floor
New York, New York 10022
(646) 503-5341
rsadowski@robertwsadowski.com
*Attorneys for Plaintiff*